Billy **HALE**, Plaintiff–
Appellee–Appellant–Cross–Appellant,

v.

Randal M. **FISH**, et al., Defendants,

Major J.W. Jones, Caddo Parish Sheriff's Office and James E. Magee, FBI Agent, Defendants–Appellants    Cross–Appellees,

and

Don Hathaway, Sheriff, Caddo Parish, Jim Byrd, Captain, Caddo Parish Sheriff's Office and Myron Fuller, FBI Agent, Defendants–Appellees.

John S. **STEPHENS**, Plaintiff–Appellee–
Cross–Appellant–Appellant,

v.

Randal M. **FISH**, et al., Defendants,

Major J.W. Jones, Caddo Parish Sheriff's Office and James E. Magee, FBI Agent, Defendants–Appellants    Cross–Appellees,

and

Don Hathaway, Sheriff, Caddo Parish, Jim Byrd, Captain, Caddo Parish Sheriff's Office and Myron Fuller, FBI Agent, Defendants–Appellees.

Billy **HALE**, Plaintiff–Appellee,

v.

Randal M. **FISH**, et al., Defendants,

Jim McGee, F.B.I, Agent J.W. Jones, Etc., Defendants–Appellants.

Nos. 88–4816, 89–4090.

United States Court of Appeals,
Fifth Circuit.

April 30, 1990.

Scott R. McIntosh, Barbara L. Herwig, Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., John A. Broadwell, Asst. U.S. Atty., Joseph S. Cage, Jr., U.S. Atty., Shreveport, La., for defendants-appellants cross-appellees.

John Milkovich, Shreveport, La., for plaintiff-appellee-appellant-cross-appellant.

Joseph W. Rausch, Stassi, Rausch & Giordano, John R. Flowers, Jr., Metairie, La., for J.W. Jones.

John S. Stephens, Shreveport, La., pro se.

Before GEE, GARZA, and DAVIS, Circuit Judges.

GARZA, Circuit Judge:

Finding the district court correctly analyzed the Section 1983 liability of Major Jones and Special Agent Magee, the extent of the qualified immunity umbrella, and the liability of Agent Fuller and Captain Boyd, the district court's liability phase of the case is AFFIRMED. Finding the adequacy of the compensatory damages and the decision of whether or not to award punitive damages and/or prejudgment interest within the discretion of the district court, we find no abuse of discretion. The award of attorney's fees to Mr. Hale, which his mother paid, is reinstated and the Judgment MODIFIED to so reflect.

## I. The Facts.

This case presents a tangled set of facts commencing in the early part of 1985 and culminating with plaintiffs' arrest on July 11, 1985. Many facts deemed pertinent by the court involve individuals who were not parties to this action. Reference to these individuals is made solely for the purpose of establishing all facts necessary to properly address the legal issues presented.

In January, Dr. Eugene Harber advised his close friend, FBI Special Agent Jim Smith, that Billy Hale, a plaintiff herein,

might have information regarding alleged improprieties in the Bossier Parish District Attorney's Office. Smith furnished Dr. Harber with a business card to be given to Hale and instructed Dr. Harber to have Hale give him a call. Dr. Harber complied. He also gave Smith a number where he could reach Hale.

Shortly thereafter, Smith contacted Hale, whereupon the two agreed to meet at the Riverboat Motel in Shreveport. Smith invited FBI Special Agent Magee, to accompany him to the meeting with Hale. Magee declined the invitation due to an illness in his family. Smith met with Hale at the motel on February 2. Also present was Deann McGlocklin, Gary Shell's girlfriend.

McGlocklin stated that 52 reel-to-reel tapes existed which provided evidence of alleged improprieties in the Bossier Parish District Attorney's Office. She further stated that the tapes had been made by Gary Shell and Frank Parks, and that the assistance of Gary Shell would be necessary to locate the tapes. At that time, the whereabouts of Gary Shell were unknown.

Some weeks later, after a fruitless search, Hale learned that Shell was incarcerated in the Bossier Parish Jail. Upon learning this fact, Hale contacted Vol Dooley, the sheriff of Bossier Parish, and requested permission to interview Shell. With Sheriff Dooley's permission, Hale interviewed Shell on April 1. Subsequent thereto, Hale requested Sheriff Dooley's assistance in trying to have Shell's bond reduced so that Shell could be bonded out of jail to locate the tapes. Judge Cecil Campbell had initially set bail for Shell at $26,000. Sheriff Dooley contacted Judge Campbell and explained to Campbell the situation regarding the alleged tapes and the necessity of Shell's assistance. Judge Campbell advised Dooley that he would take the matter under advisement, but would need to speak with Agent Smith. Sheriff Dooley relayed this message to Smith, who agreed to contact Judge Campbell.

Before Smith had an opportunity to contact Judge Campbell, Hale visited the judge. Hale advised the judge that he was working at the direction of the FBI in an effort to obtain the tapes. Merle Kimmerly, a former client of Campbell, had already informed the judge that tape recordings existed which would confirm allegations of criminal conduct involving the Bossier Parish District Attorney. Kimmerly also told the judge that Gary Shell had obtained copies of the tapes. Judge Campbell was skeptical of the information with which he had been provided by Hale and Kimmerly.

This skepticism, however, was laid to rest as a result of Judge Campbell's subsequent conversation with Smith. Smith confirmed that the FBI was conducting an investigation into alleged wrongdoings by the Bossier Parish District Attorney. When Campbell expressed his doubt over the existence of the tapes, Smith replied that the FBI had other intelligence information which supported the conclusion that the tapes did, in fact, exist. Smith assured the judge that Hale was acting at the direction of the FBI. Smith requested Campbell not to mention that the FBI was investigating the matter since, under FBI internal rules, a public official must be notified within 30 days after being targeted for an investigation. Because of Smith's representations, Judge Campbell decided to reduce Shell's bond from $26,000 to $5,000. Campbell then notified Sheriff Dooley of the bond reduction.

On April 16, Sheriff Dooley advised his chief jailer, Captain Tommy McWilliams, that two people would be coming to bond Gary Shell out of jail. Late that afternoon, Hale and William Brewer posted Shell's bond in the form of a $5,000 money order. It is undisputed that Shell freely and, indeed quite happily left the jail with Hale and Brewer. The three exited the jail through a side entrance which led to an enclosed yard where Hale and Brewer had been permitted to drive their van. Once in the van, Shell was handcuffed by Brewer to a ring on the floor of the van. When Shell asked why he was being handcuffed, the reply was, "[W]e're just doing what we were told to do."

Shell was then driven to Hale's residence on the Shirley Francis Road in Greenwood,

Louisiana. En route to Hale's residence, the van was followed by a white Cadillac driven by Clifton Guevara. It was at the home in Greenwood where Shell claimed he was threatened and intimidated with regard to the location of the alleged tapes. Present at the Hale residence, at various times, were Shell, McGlocklin, Hale, Brewer, Guevara, John S. Stephens, Kenneth Dunn, Connie Hale, Herman Meeks, and James and Dottie Collier.

The Colliers owned and operated Jaws Protection Agency. The primary activity of this business was to provide guard dogs. Hale employed the Colliers' services, whereupon a guard dog was placed in the front and rear of Hale's residence on April 16. The dogs remained at the residence until Shell was returned on April 18.

Shell indicated that the tapes were in the trunk of his car at a home in Weatherford, Texas. On April 17, Shell was driven to Weatherford for the purpose of securing the tapes. Accompanying Shell on the trip were Hale, Brewer, the Colliers, Guevara, Dunn, and McGlocklin. While in Weatherford, Shell picked up some personal belongings but did not locate any tapes. The group returned to Greenwood that same day.

On April 18, at approximately 6:00 p.m., Shell was returned to the Bossier Parish Jail by Hale and Brewer. When Judge Campbell learned that Shell had been returned to the jail, the bond was reinstated to its original amount. Shell never made a complaint of being kidnapped either to Sheriff Dooley or the chief jailer, Captain McWilliams.

Hale informed Smith that Shell had not been able to locate the tapes. As he had since February, Hale contacted and was contacted by Smith several times a week. Supervisory Resident Agent Myron Fuller (hereinafter "SRA Fuller") was aware of these contacts and instructed Smith to open an inquiry file on Hale if he planned to continue communicating with him. An inquiry file is the first step in the FBI procedure for employing an individual as an informant. After repeated requests by SRA Fuller, Smith finally opened the inquiry file on May 8.

In early to mid-June, Randal Fish began contacting various officials in Bossier and Caddo Parishes to voice Shell's complaint that he had been kidnapped on April 16. It is undisputed that these allegations, if true, implicated Smith, Sheriff Dooley, Judge Campbell and, possibly, Bruce Bolin, since Hale had been working for Bolin. On June 26, Bossier Parish District Attorney Henry Brown met with Milton Almond, chief deputy for the Caddo Parish Sheriff's department, and Special Agent Magee at the Regency Hotel in Shreveport to discuss the information that Brown had received regarding the alleged kidnapping and the FBI's connection. After this meeting, Chief Deputy Almond notified Sheriff Don Hathaway, Caddo Parish District Attorney Paul Carmouche and Major J.W. Jones, Caddo Parish Sheriff's Department, of Shell's allegations.

On June 27, a meeting was held in the conference room of the Caddo Parish Sheriff's Department, with Sheriff Hathaway, Chief Deputy Almond, Major Jones, Henry Brown, Paul Carmouche and Edwin Brewer, the attorney for Sheriff Hathaway. It was decided at this meeting that Fish should meet with them and the FBI in order to make a formal complaint on behalf of Shell. Fish made the formal complaint on June 28 at the Caddo Parish Sheriff's Office. Representatives of the Sheriff's Office, Caddo Parish District Attorney's Office and the FBI were present.

Interestingly enough, Shell pleaded guilty on June 28 to one count of possession of methamphetamines with intent to distribute, pursuant to a plea agreement with the Bossier Parish District Attorney's Office. Two counts charging the same offense were dismissed.

As a result of Brown's meeting with Almond and Special Agent Magee and Fish's formal complaint, the Caddo Sheriff's Office and the FBI opened an investigation into the alleged kidnapping. Sheriff Hathaway appointed Major Jones to lead the investigation for his office. SRA Fuller instructed Special Agent Magee to con-

duct the investigation on behalf of the FBI. Major Jones and Special Agent Magee co-operated extensively in the investigation and, in fact, jointly interviewed at least four key witnesses. Assisting in the investigation to a lesser degree were SRA Fuller, Chief Deputy Almond and Captain Jim Byrd. Information gathered and compiled by these individuals between June 29 and July 11 resulted in the issuance of a warrant for the arrest of plaintiffs, Guevara, Brewer and Dunn.

The investigation began with Major Jones' interview of Shell, who told of being handcuffed to a ring in the floor of the van by Brewer and then taken against his will to Hale's residence in Greenwood. Shell advised Major Jones that he was repeatedly questioned about the location of the tapes. According to Shell, his life was threatened by Dunn who said that he would shoot him "full of holes" if he tried to get away. Shell admitted that he lied to Hale and the others regarding his knowledge of the tapes, simply because he wanted to get out of jail. When Hale and the others learned that Shell would not be able to produce the tapes, Hale and Brewer returned Shell to jail and recovered the bond money.

On June 29, Major Jones contacted Herman Meeks at Hale's residence. Meeks, who was living at Hale's house, stated that he was in Shreveport on April 16 and 17, but stayed at the Motel 6 on Monkhouse Drive because there were too many people at Hale's residence. A check by Jones of records at the Motel 6 confirmed that Meeks had stayed there on the 16th and 17th, though Meeks normally lived at the Hale residence. He also told Major Jones that he went by Hale's residence to shower and pick up some personal belongings, at which time he observed Shell playing cards with McGlocklin and Dottie Collier. Meeks stated that there was no indication that Shell was being held against his will.

On July 1, Major Jones interviewed James and Dottie Collier. Dottie Collier confirmed that she played cards with Shell and McGlocklin. The Colliers stated that there was no indication that Shell was threatened in any way or was being held against his will. According to the Colliers, he went outside whenever he wanted to and appeared to have the run of the house. They added that they saw Shell "way out" in the back yard where he was lying in the sun with his girlfriend. The only weapons observed by the Colliers were a rifle sitting in the corner of the pool room and a pistol in McGlocklin's purse.

James Collier called Major Jones on the evening of July 1 and indicated that they wished to give a second statement which was taken by Jones on July 2. The only significant change in the Colliers' story was that, contrary to their statement of July 1, they admitted going to Texas on April 17. They also added that they were advised that the dogs would be used to keep people away from the house because Shell was afraid for his life. When asked what part John Stephens played, James Collier replied: "Well, to tell you the truth, I don't, I don't think he played any part. I think he was drunk all the time." The Colliers reiterated their prior statement regarding the existence of weapons and Shell's freedom, including ample opportunities for Shell to leave the residence if he desired.

On July 2, Major Jones and Special Agent Magee took McWilliams' statement. According to McWilliams, Shell signed the bond and freely left with Hale and Brewer. During the interview McWilliams was twice asked whether Fish or Shell made a complaint to him regarding the alleged kidnapping. Although Shell remained confined in jail for over 10 weeks after April 18, McWilliams replied that no complaint was ever made and that he had learned of the allegations only a week prior to the interview. Finally, McWilliams advised Jones and Magee that on June 28, Shell was taken to court where he pleaded guilty to one count of possession of methamphetamines with intent to distribute, whereupon *nolle prosequi* was entered on two additional counts.

Major Jones and Special Agent Magee also interviewed Sheriff Dooley on July 2. Sheriff Dooley related the entire chain of events from his meeting with Kimmerly

through the bonding out of Shell. Sheriff Dooley advised Jones and Magee that Smith had confirmed that Hale was working for the FBI and that the FBI was investigating Henry Brown. Dooley stated that Smith also confirmed that Hale was working with the FBI regarding the location of the tapes and that Shell's assistance was needed. Sheriff Dooley further related his conversations with Judge Campbell and Smith regarding the bond reduction.

On July 3, Major Jones, SRA Fuller, and Special Agent Magee interviewed Judge Campbell, who reiterated the essence of what Sheriff Dooley had stated regarding the events leading up to Shell's bond reduction. Judge Campbell made it clear that it was his impression, based on conversations with Smith, that there was an investigation into alleged wrongdoings involving Brown and that Hale was assisting the FBI in that investigation. Judge Campbell made it equally clear that he reduced the bond only after Smith expressly requested him to do so. Judge Campbell believed that he was reducing the bond to further an FBI investigation.

On July 5, Major Jones and Captain Byrd interviewed Merle Kimmerly, who denied having discussed the matter with Judge Campbell. Kimmerly did admit, however, to calling Sheriff Dooley, and also acknowledged that Dooley had met Hale at Kimmerly's house, whereupon Hale advised Dooley that he could get the tapes with Shell's assistance. Kimmerly advised the officers that Hale had stated he was working with the FBI in its investigation of Brown and that the FBI had convinced Judge Campbell to reduce Shell's bond. Kimmerly further stated that Hale told him that no force of any kind was used while Shell was at Hale's residence. When asked whether he had anything else to add, Kimmerly responded:

> I'd like to say is . . . that it's strictly not any kidnapping because the boy was too willing, according to Billy Hale, to cooperate and, ah, ah, you want my opinion, ah, I think the whole thing has been propped up by the boy's [Shell's] attorney to work a deal through him or Brown to get these charges dropped.

And which he's already done. And, uh, I think, ah, they've done a real nice job. But, ah, there's no kidnapping whatsoever.

On July 10, Major Jones and Special Agent Magee interviewed State Representative Bruce Bolin at his office in Minden, Louisiana. Magee and Jones inquired about Bolin's knowledge of Hale. Bolin stated that in the summer of 1984, Hale began working on his political campaign for Bossier–Webster Parish District Attorney. Hale had told Bolin at some point during the campaign that tapes purportedly existed which incriminated Brown. Even after Bolin lost the election against Brown, Hale continued in his efforts to locate the tapes. In a conversation that Bolin had with Hale in early 1985, Hale stated that he was working with FBI Special Agent Smith in order to acquire the tapes. Bolin stated that he was convinced that Hale was working for the FBI. Bolin was the last individual interviewed by the Caddo Parish Sheriff's Office prior to issuance of the arrest warrants. Thus, all persons interviewed, with the exception of Shell, strongly indicated that no kidnapping occurred and that Hale was working for the FBI when he and Brewer bonded Shell out of jail.

On July 10, SRA Fuller and his supervisor took a statement from Smith. It is worthy to note that Smith was never interviewed by the Caddo Parish Sheriff's Office. Also, SRA Fuller had ordered Smith not to discuss the matter with the press and to cease contact with Hale. The statement was taken during an FBI internal investigation of Smith which resulted from the allegations of Fish and Shell.

Though Smith acknowledged several contacts with Hale regarding the existence of the tapes, he claimed a passive role. Smith denied that he ever purported to conduct an investigation into alleged wrongdoings at the Bossier Parish District Attorney's Office. Smith admitted, however, that in April, Sheriff Dooley had furnished him with a box, three feet in length and ten to twelve inches high, which was filled with

letters described by Sheriff Dooley as notification from Brown's office of numerous dismissals of criminal charges. Sheriff Dooley considered the inordinate number of dismissals to be malfeasance committed by the district attorney. Smith accepted the box and showed sample letters from it to SRA Fuller and Special Agent Magee.

Smith denied ever expressly requesting Judge Campbell to lower the bond. Smith did acknowledge, however, that Sheriff Dooley had called him to inform him that Judge Campbell wished to speak with him concerning Shell's bond reduction. Smith admitted calling Judge Campbell and telling the judge of his interviews with Hale and McGlocklin. Smith advised Campbell that Hale had visited Shell in jail whereupon Shell told Hale that he knew where the tapes were but would need to get out of jail in order to lead Hale to them. Smith acknowledged that Judge Campbell could have inferred that the FBI was conducting an investigation, inasmuch as Smith had provided background information without comment as to its veracity and without an express statement that a pending investigation did not exist.

Smith stated that he first learned of Shell's kidnapping allegations in early June after a phone call by Fish. Subsequent to that conversation, Smith called Hale. Hale told him that Brewer went to the jail with him and handcuffed Shell in the van so he would not run away. Smith had been in contact with Hale on April 17, at which time Hale gave Smith no indication that Shell was being held against his will. Based on Smith's knowledge, he advised SRA Fuller that it was his opinion that no kidnapping occurred.

The FBI's internal investigation of Smith concluded that Smith had violated numerous FBI procedures. The FBI report acknowledged that Smith clearly gave the impression that the FBI had an investigative interest in Shell's bond reduction, as well as the Bossier Parish District Attorney's Office. The report concluded that due to "multiple instances of extremely poor judgment in this matter ... that Special Agent Smith can no longer effectively function as a special agent of the FBI." As an option to being dismissed, Smith was permitted to retire.

The pivotal meeting in this chain of events occurred on July 11 at the Caddo Parish Sheriff's Office. Present were District Attorney Paul Carmouche and his first assistant, Marty Stroud, Sheriff Hathaway, Chief Deputy Almond, Major Jones, SRA Fuller and Special Agent Magee. The meeting lasted for three to four hours that afternoon, during which time the investigating officers purportedly disclosed the results of their investigation regarding the alleged kidnapping for the purpose of determining whether probable cause existed. The district court below found, however, that critical information obtained during the course of the investigation was not disclosed either by Major Jones or Special Agent Magee, the two officers charged with leading the investigation for their respective offices. Specifically, Assistant District Attorney Stroud testified that there was no discussion regarding Hale working with Smith in an effort to secure the tapes. Stroud stated that if he had been aware of Sheriff Dooley's statements regarding Hale's involvement with Smith, he would have required further investigation. Stroud also testified that he was not made aware of the Colliers' statements which indicated that Shell was not held against his will. According to Stroud, no mention was made of Shell's plea bargain.

SRA Fuller advised those present at the July 11 meeting that the FBI was not investigating the Bossier Parish District Attorney's Office. According to SRA Fuller, any action taken by Smith was unauthorized and beyond the scope of his duties. Though SRA Fuller, advised those present of Smith's statement regarding Brewer handcuffing Shell, he failed to disclose Smith's opinion that no kidnapping occurred. Neither SRA Fuller nor Special Agent Magee advised the Caddo officials that Fuller had earlier instructed Smith to open an inquiry file indicating Hale as a source of information or that the file had, in fact, been opened.

At the meeting, Carmouche designated Assistant District Attorney Stroud to handle the matter. Stroud determined that it was the consensus of those present at the meeting that probable cause existed for the arrest of plaintiffs, Guevara, Brewer, and Dunn. With Major Jones' assistance, Stroud drafted an affidavit. The affidavit was then reviewed and executed by Major Jones. Stroud, Major Jones, and Special Agent Magee then proceeded to the office of Judge Carl Stewart for presentation of the affidavit. The parties stipulated that "[n]o assertions or other information was furnished Judge Stewart beyond the contents of the affidavit as written."

Judge Stewart determined that probable cause existed, whereupon warrants were issued for the arrest of plaintiffs, Guevara, Brewer, and Dunn. With respect to plaintiff, John Stephens, it is noteworthy that the affidavit and subsequent warrants accused plaintiffs of aggravated kidnapping in violation of La.Rev.Stat. 14:44. No conspiracy was alleged, nor was an aider and abettor theory set forth.

Stephens and Hale were arrested on the same day that the warrants issued—July 11. The Caddo Parish investigation continued until August 14, when a Caddo Parish Grand Jury returned a no true bill. The FBI investigation was subsequently closed.

*Proceedings Below.*

Plaintiffs instituted this action under 42 U.S.C. § 1983, alleging that their arrest for aggravated kidnapping was without probable cause, in violation of their rights under the Fourth and Fourteenth Amendments to the United States Constitution. The district court held that plaintiffs were arrested for aggravated kidnapping without probable cause.

The district court reasoned that the lack of probable cause is attributable to the totality of the circumstances which included an affidavit devoid of any indication as to Shell's veracity and reliability despite numerous factors which would have placed a reasonable and prudent officer on notice that a further inquiry into Shell's veracity and reliability was warranted. In addition, the results of the investigation failed to substantially corroborate Shell's bizarre story, especially with regard to his allegation that he was held against his will. The violations under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), however, dealt the lethal blow to an already crippled affidavit. These violations included false and misleading statements, as well as material omissions relevant to the probable cause determination.

With regard to Major Jones and Special Agent Magee, the district court concluded that the chain of causation was not broken either by the acts of Assistant District Attorney Marty Stroud or Judge Carl Stewart. Finally, the district court rejected defendants' claim of qualified immunity as their acts clearly were not objectively reasonable under the rationales of *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), and *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

The district court found Major Jones and FBI Special Agent Magee liable to Hale for $90,000 (which amount was later reduced by $25,000 reflecting the reversal of the award of attorney's fees) and liable to Stephens in the amount of $54,000. The other defendants were not held liable as the court found their connection to the defective affidavit to be too remote. Major Jones and Special Agent Magee appeal the judgment. Hale and Stephens cross-appeal, contending that the court erred in not holding Defendants Fuller and Byrd liable, that the award of compensatory damages is inadequate, that punitive damages should have been included in the award and that prejudgment interest on the award should have been granted. In addition, Hale appeals the court's reduction of his award by $25,000, the amount of attorney's fees expended in defense of the criminal kidnapping charges which were paid by his mother.

## II. Liability of Major Jones and Special Agent Magee.

In reviewing a district court's probable cause determination, this court is not limited to the "clearly erroneous" standard and

may make an independent review of the sufficiency of an affidavit. *United States v. Phillips,* 727 F.2d 392, 394–95 (5th Cir. 1984). In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court adopted the "totality of the circumstances" test for determining whether a search warrant is supported by probable cause. Under *Gates:*

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]" that probable cause existed."

462 U.S. at 239–40, 103 S.Ct. at 2332–33 (citing *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). Although *Gates* dealt with the issue of whether a search warrant was properly issued, it has been applied to cases involving arrest warrants as well. *See, e.g., United States v. Jackson,* 818 F.2d 345 (5th Cir.1987).

In determining that probable cause was lacking for the issuance of the arrest warrants in the present case, the court below found two defects in the affidavit supporting the warrant. First, the court found that the affidavit made no reference to Shell's reliability as an informant. Second, the court found that the affidavit contained misstatements and material omissions.

### A. *Reliability of informant*

■ The appellants' contend that no evidence of Shell's veracity was required in the affidavit, as he was a "victim eyewitness" whose reliability need not be proven. *See Jackson,* 818 F.2d at 348. Although this is generally true, an exception is made in cases where the witness has a motivation to lie, or there is some other indication that the information is not reliable. *See Jackson; United States v. Phillips,* 727 F.2d 392 (1984).[1]

In the present case Shell had ample motive to lie. Shell was being prosecuted by the Bossier County District Attorney's Office, the subject of the alleged kidnappers' investigation. In view of two counts of Shell's indictment being dropped the same day the kidnapping complaint was made, Shell's statement is consequently lacking in the usual reliability given victim eyewitnesses.

The appellants contend that even if Shell is deemed to have diminished reliability, the basis of Shell's information and independently obtained information corroborating Shell's story renders the affidavit sufficiently trustworthy to meet the *Gates* totality of the circumstances test. This contention has merit. As noted in *Jackson,* the failure to demonstrate an informant's veracity may be remedied by demonstrating a strong basis of knowledge. 818 F.2d at 349. In this present situation, the information contained in Shell's statement is based

---

1. In *Phillips,* the wife of the defendant told the police that her husband, a convicted felon, possessed a sawed-off shotgun. Based upon the wife's affidavit a search warrant was issued. The court found that although a victim eyewitness, her reliability was greatly diminished by possible motives for retaliation, as she had recently had a fight with her husband. Recognizing that under *Gates,* uncertainty regarding an informant's veracity could be compensated for by a strong showing of "basis for knowledge," this court held the wife's detailed information and close association with the defendant sufficient to support a finding of probable cause based on her affidavit. *Id.* at 399–400. The outcome in *Phillips* may be contrasted with the decision in *Jackson,* 818 F.2d 345 (5th Cir.1987).

In *Jackson,* the perpetrator of a robbery implicated the defendant in a sworn statement. This statement was used as the basis of an affidavit supporting an arrest warrant. As with *Phillips,* we noted that the informant had a motive to lie (spreading the blame for the crime), which diminished his reliability. In looking to the informant's "basis of knowledge," it was found that although the statement asserted that the informant witnessed the defendant help extricate the getaway car from where it was stuck, the statement provided no basis for its assertion that the defendant "knew" that a robbery had taken place. Noting that if the statement "were only slightly more complete in other respects," it would have been sufficient, the court held that it did not establish probable cause.

on firsthand observation. This, combined with the corroborating information included in the affidavit is enough to meet the totality of the circumstances test as it was applied in *Jackson*.[2]

### B. *Franks v. Delaware*

In addition to finding the statement of Gary Shell insufficient to support the affidavit upon which the arrest warrants were issued, the district court found the affidavit to contain misstatements and omissions which constituted constitutional violations under *Franks v. Delaware*.[3] The district court found the following misstatements important: the affidavit referred to the dogs posted at the property as "attack dogs" instead of "guard dogs;" the affidavit identified Hale as the person who handcuffed Shell in the van, when it was known by the officers to have been performed by Hale's companion, Brewer; the affidavit suggested that Shell was kidnapped from within the jail, although Shell had told investigators that the alleged kidnapping had occurred outside of the jail; the affidavit identified a number of individuals as "people at the house," although the presence of some of the individuals, including Mr. Stephens, was sporadic. The appellants contend that these misstatements, if corrected, would have had little effect on the magistrate's finding of probable cause. Although these misstatements demonstrate a slanting of the facts, probable cause would still have existed had the statements been accurate.

The omissions from the affidavit, however, are of a more serious nature. As noted in the facts above, there was no mention of information garnered from a number of witnesses which tended to contradict Shell's kidnapping allegations.

The appellants contend that even if the omitted information was material, there was no indication that the omission was intentional or reckless. If the facts omitted from an affidavit are "clearly critical" to a finding of probable cause, then recklessness may be inferred from the proof of the omission itself. *United States v. Martin*, 615 F.2d 318, 329 (5th Cir.1980). A number of the facts omitted from the affidavit in the present case fall into the "clearly critical" category. For example, a number of those interviewed prior to the signing of the affidavit expressed their belief that the actions taken by the alleged kidnappers was done pursuant to an ongoing FBI investigation. Also, virtually everyone interviewed, with the exception of Shell, expressed the belief that Shell was not being held against his will.[4] As noted by the district court, the omitted facts are especially effective in negating probable cause as to Mr. Stephens, as Shell had admitted that Mr. Stephens was not armed and the interviews revealed that he was only present in the house part of the time Shell was there. The district court did not err in holding that the affidavit was insufficient to support a finding of probable cause.

### C. *Major Jones*

■ The affidavit at issue in this case, although signed by Major Jones, was drafted by Marty Stroud, the First Assistant District Attorney of Caddo Parish. Major Jones contends that the actions of Assist-

---

**2.** The appellees, as did the court below, maintain that the corroborating information consists of nothing more than innocent, trivial details. This greatly understates the importance of the information viewed as a whole. Although it is true that there is nothing illegal about bonding someone out of jail and taking them to a house with dogs posted outside, these details viewed together with the handcuffing of a person to the floor of a van provide substantial corroboration of the kidnapping allegations.

**3.** In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that if an officer, in an affidavit supporting a warrant, makes a false statement knowingly and intentionally, or with reckless disregard for the truth, the false statements must be disregarded in determining whether the affidavit is sufficient to support a finding of probable cause. *Id.* at 171–72. The holding in *Franks* applies to omissions as well. *United States v. Thompson*, 615 F.2d 329 (1980).

**4.** Additionally, a number of people interviewed rebutted Shell's contention that all present in the house were armed, stating that the only one armed in the house was Deann McGlocklin, Shell's girlfriend.

ant District Attorney Marty Stroud and the Magistrate break the causal chain between his acts and the plaintiffs' deprivation of Fourth Amendment rights. In support of this theory, Major Jones relies upon *Hand v. Gary*, 838 F.2d 1420 (5th Cir.1988), which held that

> even an officer who acts with malice in procuring the warrant or the indictment will not be liable if the facts supporting the warrant or indictment are put before an impartial intermediary such as a magistrate or a grand jury, for that intermediary's independent decision breaks the causal chain and insulates the initiating party.... Any misdirection of the magistrate or the grand jury by omission or commission perpetuates the taint on the original official behavior.

838 F.2d at 1427–28. His reliance on this theory is unavailing.

Major Jones contends that although he stipulated that the affidavit contained all of the facts before the magistrate, there was other information provided. Major Jones does not state the substance of this information and cites no place in the record where it may be found. Major Jones also maintains that he presented all of the relevant facts to Assistant District Attorney Stroud who drafted the affidavit. The appellees, however, indicate that the record reflects a number of material facts not presented to Assistant District Attorney Stroud. Even if Major Jones had presented all of the facts to Assistant District Attorney Stroud, his causation theory fails as an assistant district attorney is not an "impartial intermediary" under *Hand v. Gary*, 838 F.2d 1420 (5th Cir.1988).

### D. *Special Agent Magee as "Conspirator"*

Special Agent Magee contends that as he did not sign, prepare, assist in preparing, or even read the affidavit at issue, the district court erred in holding him liable for the plaintiffs' deprivation of their Fourth Amendment rights. In its original Memorandum Opinion, dated April 22, 1988, the district court appeared to assess liability on Special Agent Magee because he led the investigation for the FBI and because he accompanied Major Jones when the affidavit was presented to the magistrate. When Special Agent Magee contested the April ruling, the court affirmed its prior holding in a Memorandum Ruling, dated October 27, 1988. In this ruling, the district court relied upon a conspiracy theory for holding Special Agent Magee liable. *See, e.g., Villanueva v. McInnis*, 723 F.2d 414, 418 (5th Cir.1984). The district court noted that Special Agent Magee's presence may have lent credibility when the affidavit was presented to Judge Stewart, due to Special Agent Magee's prior working relationship with Judge Stewart.[5] The court also noted that Special Agent Magee took an active role in the physical arrest of Hale.

■ Although Special Agent Magee concedes that conspiracy theory may be used to hold a federal agent liable for the misdeeds of a state official, he maintains that his actions were taken simply to further a legitimate federal investigation, and that he did not contribute to the deprivation of the plaintiffs' rights. The facts of this case demonstrate that Special Agent Magee had knowledge of the exculpatory information; and since Special Agent Magee's presence when the affidavit was submitted tended to influence the judge, he was under the same obligation as Major Jones to present all the evidence relevant to whether probable cause existed. By failing in this obligation, he assisted Major Jones in depriving the plaintiffs of their Fourth Amendment rights.[6]

### III. *Qualified Immunity.*

■ Both Major Jones and Special Agent Magee contend that the court erred in re-

---

**5.** Special Agent Magee worked together with Judge Stewart at the U.S. Attorneys office.

**6.** The appellees point out that in a taped conversation of Gary Shell, Shell stated that Special Agent Magee was in Henry Brown's office prior to the plaintiffs' arrest in which Shell agreed with Agent Fuller and Henry Brown to claim that he was kidnapped in exchange for good treatment. Although the court did not mention the tape in its ruling, the conversation, if credited, would be sufficient standing alone to support the court's finding of conspiracy.

jecting their defense of qualified immunity. Under the doctrine of qualified immunity, federal and state law enforcement officers may be held liable for Fourth Amendment violations only if their actions violate "clearly established" rights. *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). In other words,

> "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but is to say that in light of preexisting law the unlawfulness must be apparent."

*Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039.

In the present case, Major Jones submitted an affidavit found by the district court to contain material misstatements and omissions of such character that no reasonable official would have submitted it to a magistrate. As this finding is supported by the record, the court did not err in denying qualified immunity to Major Jones.

■ Special Agent Magee contends that the district court erred in denying him qualified immunity under either an active participant theory or a conspirator theory. He maintains that no reasonable officer would know that a failure to correct the defects in a state officer's affidavit or a failure to forestall the issuance of the warrant to a state officer would be a violation of a person's rights. He likewise maintains that a reasonable officer would not suspect that the participation in an investigation, attendance during the presentation of the warrant application and presence during an arrest would be deemed a conspiracy to violate one's rights.

What Special Agent Magee fails to consider is the evidence demonstrating his knowledge of exculpatory information; although his is a closer case than with Major

Jones, it is likely that a reasonable officer having the information possessed by Special Agent Magee during the events at issue would have known that his conduct in assisting Major Jones in the plaintiffs' arrest would have been a violation of the Fourth Amendment. Consequently, the district court did not err in denying qualified immunity to Special Agent Magee.

## IV. Agent Fuller and Deputy Sheriff Byrd.

The district court determined that defendants Deputy Sheriff Jim Byrd, Sheriff Don Hathaway and FBI Agent Myron Fuller were not liable for any participation that they may have had in the arrest of the plaintiffs. The plaintiffs appeal the court's dismissal of Deputy Byrd and Agent Fuller.

■ Agent Fuller was present at the July 11 meeting in which the decision was made by state officials to procure an arrest warrant for the plaintiffs. During the meeting Fuller related the information he had received from Agent Smith concerning Smith's involvement in the affair. In relating the information, Agent Fuller left out information that an inquiry file had been opened on Mr. Hale [7] and that Agent Smith had voiced his opinion that no kidnapping had occurred. Although finding these omissions "unprofessional," the district court found that they failed to rise to the level of a constitutional violation. The district court was correct in its characterization of the omissions. The opening of an inquiry file on Mr. Hale might have had more significance had an official investigation been authorized. Likewise, Agent Smith's opinion that no kidnapping had occurred was not based on any first-hand knowledge and may have been motivated by the fact that he was involved in the activities.

The plaintiffs maintain that in addition to the omissions noted by the trial court, Agent Fuller misled those present at the July 11 meeting by telling them that there had been no official FBI investigation of Henry Brown. Agent Fuller's statement

---

**7.** Opening an inquiry file is the first step in making someone an informant.

that there had been no official FBI investigation, although accurate, might have been misleading had he said nothing more; it was not misleading, however, as Agent Fuller went on in the meeting to detail Agent Smith's unofficial involvement in the events at issue. Thus, the district court did not err in dismissing Agent Fuller.

■ The plaintiffs contend that Deputy Byrd assisted in the violation of their rights by his employing coercive tactics upon a witness, Mrs. Collier,[8] in an effort to pressure her into making a statement against the plaintiffs. The plaintiffs' contention is based on Mrs. Collier's testimony at trial, in which she alleges that after giving a statement concerning the events at issue to Deputy Byrd, he pressured Mrs. Collier to "tell the truth." This testimony leads to two conflicting inferences: first, that Byrd knew Mrs. Collier was telling the truth in her statement and, by telling her to "tell the truth," implicitly urged her to lie; second, that Deputy Byrd felt that she was lying and wanted her to tell the truth. The district court was free to choose the latter inference and did not err in dismissing Deputy Byrd.

*V.  Adequacy of the Compensatory Damages.*

■ The plaintiffs contend that the court's award of compensatory damages is inadequate. A trial judge's assessment of damages is a finding of fact which is reviewed under the "clearly erroneous" standard. *Johnson v. Offshore Express, Inc.,* 845 F.2d 1347, 1356 (5th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988). This court will not overturn a damage award unless the trier of fact abused its discretion. *Id.* The propriety of awards are not determined by comparing verdicts in similar cases, but rather by a review of the facts of each case. *Id.*

In makings its award, the district court took into account several factors: the time spent in jail, the mental anguish suffered, the damage to reputation suffered, and the legal fees incurred to defend the criminal charges. Although the plaintiffs cite cases in which higher awards for wrongful detention were upheld on appeal, they fail to demonstrate that the award given in the present case was "clearly erroneous."

*VI.  Hale's Attorney's Fees.*

■ The trial court originally included $25,000 in Hale's award for the amount expended in his defense of the criminal charges against him. The defendants then filed a motion to amend judgment, which was granted. In granting the motion, the court reasoned that as the fee was paid by Hale's mother and there was no testimony that Hale was indebted to his mother for the fee she paid, and thus he could not recover it.

Hale points out that although he offered no testimony concerning repayment, the fee agreement in the record reflects his mother and sister as "additional obligors" who have agreed to pay the attorney "in solido" with Hale.

Under Louisiana Civil Code Article 1804, "[i]f the circumstances giving rise to [a] solidary obligation concern only one of the obligors, that obligor is liable for the whole to the other obligors who are then considered only as his sureties." Hale points out that the evidence in the present case clearly demonstrates that the attorney's fee concerns only him, making him liable by law to his mother for the entire amount. The defendants do not challenge this contention. Rather, they contend that a legal debt to one's mother is not the kind of "actual" damage contemplated in a 1983 award of compensatory damages. *See Memphis Community School District v. Stachura,* 477 U.S. 299, 305–09, 106 S.Ct. 2537, 2541–44, 91 L.Ed.2d 249 (1986). The defendants maintain that Hale's indebtedness is merely theoretical until it is proven that the debt has or will be actually repaid.

---

8. Mrs. Collier and her husband are the proprietors of "Jaws Protection Agency," which provided the guard dogs stationed at the Hale home.

The defendants' offer no case law demonstrating that a legal debt evidenced by a surety contract is any less of a debt because it is owed to one's mother. As Hale incurred a legal debt of $25,000 as a consequence of the appellant's conduct, the district court erred in reducing the amount of his original award by that amount.

## VII. Punitive Damages.

■ The standard for the assessment of punitive damages in a 1983 action was enunciated by the Supreme Court in *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), in which the Court held

> that a jury may be permitted to assess punitive damages in an action under 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. We further hold that this threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness.

*Smith*, 461 U.S. at 56, 103 S.Ct. at 1640. The plaintiffs note that the district court's opinion in the liability portion of the trial made a specific finding that the facts presented to Judge Stewart in the affidavit "were both selective and slanted to the extent that they were either deliberately false or made with a reckless disregard for the truth." The plaintiffs contend that this finding requires an award of punitive damages under *Smith*.

This contention demonstrates that the plaintiffs have read *Smith* selectively. In *Smith*, the Court rejected the plaintiffs' argument that simply because the threshold of liability for compensatory damages is the same as for punitive damages, both are equally available. *Smith*, 461 U.S. at 51–52, 103 S.Ct. at 1637–38. The Court held that unlike compensatory damages, punitive damages are never available as a matter of right, no matter how egregious the defendant's conduct may be. *Id.* As the question of whether punitive damages should be awarded is one left to the finder of fact, the district court did not err in denying to award them.

## VIII. Prejudgment Interest.

■ The plaintiffs contend that the district court erred when it denied them prejudgment interest on the award, yet failed to cite any cases from this circuit on the issue of whether prejudgment interest is mandatory in § 1983 actions.

As stated in *Masters v. Transworld Drilling Co.*, 688 F.2d 1013, 1014 (5th Cir. 1982), this court held that prejudgment interest was "well-nigh automatic" in admiralty suits, but noted that such an award was, in most cases, "within the Court's sound discretion." Similarly, in *Parson v. Kaiser Aluminum & Chemical Corporation*, 727 F.2d 473 (5th Cir.1984), *cert. denied*, 467 U.S. 1243, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984), this court stated that "[t]he award of prejudgment interest in this case reflects an appropriate exercise of the district court's authority to fashion relief which makes whole the injured party." The First Circuit in *Blackburn v. Snow*, 771 F.2d 556, 573 (1st Cir.1985), held, in a 1983 action, that an award of prejudgment interest was at least partially improper as a portion of the compensatory award involved intangible losses. Thus, the fate of the prejudgment interest is in the hands of the district court. The district court below did not abuse its "authority to fashion relief" in denying prejudgment interest in the present case.

## IX. The End Result.

The district court did not err in holding Major Jones and Special Agent Magee liable under § 1983 for their arrest, without probable cause, of the plaintiffs. Major Jones and Special Agent Magee were not entitled to qualified immunity, as the district court properly held. Claims against Agent Fuller and Captain Byrd were properly dismissed by the district court. The adequacy of the compensatory damages award, the decision not to award punitive damages, and the decision not to award prejudgment interest were all within the discretion of the district court and that discretion was not abused. The district court's award to Mr. Hale of attorney's fee

paid by his mother, which was later abandoned, is hereby reinstated. For the foregoing reasons, the judgment of the district court is AFFIRMED as MODIFIED.