Camille DeLOACH, Plaintiff–Appellee,

v.

Mitzi BEVERS, Defendant–Appellant.

No. 88–2978.

United States Court of Appeals,
Tenth Circuit.

Dec. 31, 1990.

Robert E. Manchester (Haven Tobias with him on the brief) of Cooper, Manchester, Hiltgen & Healy, Oklahoma City, Okl., for defendant-appellant.

Steven M. Angel (Carl Hughes with him on the brief), Oklahoma City, Okl., for plaintiff-appellee.

Robert H. Henry, Atty. Gen. of Oklahoma, and Robert A. Nance, Asst. Atty. Gen., Chief, Federal Div., Oklahoma City, Okl., filed an amicus curiae brief on behalf of the State of Oklahoma in support of defendant-appellant.

James P. Manak, Associate Counsel, and Wayne W. Schmidt, Executive Director, Americans for Effective Law Enforcement, Inc., Chicago, Ill. (of counsel Fred E. Inbau, John Henry Wigmore, Professor of Law Emeritus, Northwestern University School of Law, Chicago, Ill.) filed an amicus curiae brief on behalf of Americans for Effective Law Enforcement, Inc., joined by The Intern. Ass'n of Chiefs of Police, Inc., The Nat. Dist. Attys. Ass'n, The Nat. Sheriffs Ass'n, and The Oklahoma Ass'n of Chiefs of Police in support of defendant-appellant.

Before LOGAN and BRORBY, Circuit Judges, and BRATTON, District Judge.[*]

LOGAN, Circuit Judge.

Defendant Mitzi Bevers[1] appeals from judgment entered following a jury verdict in favor of plaintiff Camille DeLoach in her civil rights action under 42 U.S.C. § 1983. Bevers asserts that the district court erred in failing to grant her motions in the alternative for judgment notwithstanding the verdict or a new trial.

This case arises out of the investigation into the death of eighteen-month-old Ryan

Swift. Both of Ryan's parents had full-time jobs, and DeLoach was Ryan's day-care sitter. Ryan's father left him at De-Loach's home in the morning of September 11, 1985, and when Ryan's mother arrived to pick him up at 4:00 that afternoon, Ryan was comatose. He was taken to a hospital, where he died the next day from swelling of the brain caused by a severe blow to the head.

The attending neurologists who operated on Ryan were of the opinion that the blow to Ryan's head was so severe that it would have rendered him unconscious immediately, and, therefore, had to have occurred while Ryan was in DeLoach's care. The medical examiners who performed the autopsy on Ryan and another expert were of the opinion that the blow could have been delivered some time before September 11. The autopsy also revealed numerous bruises on Ryan consistent with persistent abuse.

Bevers was the police detective assigned to investigate Ryan's death. Some time in October 1985, she presented the case file of her investigation to Assistant District Attorney Donald Deason. Deason declined to proceed, believing the evidence was insufficient to convict. But in March 1987, at the urging of Douglas L. Polk, M.D., one of the attending neurologists, District Attorney Robert Macy decided to initiate prosecution of DeLoach for first degree murder. Bevers prepared an affidavit which induced a magistrate to issue a warrant for De-Loach's arrest. DeLoach was arrested and after a preliminary hearing was bound over for trial. After a jury was empaneled for DeLoach's trial, the government withdrew the charge.

DeLoach then filed this § 1983 suit alleging that Bevers violated DeLoach's constitutional rights by retaliating against her for exercise of her right to retain counsel and by preparing an intentionally false and misleading affidavit which caused her arrest on first degree murder charges. The

---

[*] The Honorable Howard C. Bratton, Chief Judge, United States District Court for the District of New Mexico, sitting by designation.

1. Defendant married after commencement of this action and is sometimes referred to in the record as Mitzi Bevers Welch, Mitzi Welch, or Detective Welch.

jury found for DeLoach on both counts, awarding compensatory damages of $150,000 and punitive damages of $75,000. We affirm.

I

DeLoach's claim of unconstitutional retaliation alleged that Bevers took various actions leading to DeLoach's arrest and to her being bound over for trial, and that Bevers did so in retaliation for DeLoach's decision to hire an attorney when she became a suspect in Ryan's death. "An act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *Matzker v. Herr,* 748 F.2d 1142, 1150 (7th Cir.1984); *see also Norwell v. City of Cincinnati,* 414 U.S. 14, 16, 94 S.Ct. 187, 188, 38 L.Ed.2d 170 (1973); *Haynesworth v. Miller,* 820 F.2d 1245, 1257 (D.C.Cir.1987); *Losch v. Borough of Parkesburg,* 736 F.2d 903, 907–08 (3d Cir. 1984). The unlawful intent inherent in such a retaliatory action places it beyond the scope of a police officer's qualified immunity if the right retaliated against was clearly established. *See Coen v. Runner,* 854 F.2d 374, 378–79 (10th Cir.1988); *Losch,* 736 F.2d at 909–10.

■ Bevers contends that DeLoach had no Sixth Amendment right to counsel when she was merely a suspect in the criminal investigation. The right to retain and consult with an attorney, however, implicates not only the Sixth Amendment but also clearly established First Amendment rights of association and free speech. *See generally United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). "Thus, while private parties must

ordinarily pay their own legal fees, they have an undeniable right to retain counsel to ascertain their legal rights." *Martin v. Lauer,* 686 F.2d 24, 32 (D.C.Cir.1982) (footnote omitted).

■ There was sufficient evidence from which a reasonable jury could conclude that Bevers worked to cause DeLoach's arrest and prosecution at least partly in retaliation for DeLoach's decision to hire an attorney. Dennis DeLoach testified that after his wife hired an attorney, Bevers expressed displeasure, saying, "Well that's not being very cooperative," and thereafter appeared unhappy with DeLoach. II R. 99–100. A retired police officer acquainted with DeLoach testified that when he called on the night of DeLoach's arrest to ask if Bevers would allow DeLoach to surrender herself to authorities, Bevers replied, "Payback is hell, that's what she got for hiring a smart-ass lawyer." III R. 311. Bevers admitted saying "payback is hell" in reference to DeLoach's failure to "cooperate." IV R. 542, 610. At trial Bevers persisted in contending that DeLoach did not cooperate, but she never identified any such failure. She admitted that DeLoach answered all questions she asked in her interviews and voluntarily permitted a search of her house. The only evidence in the record supporting any failure to cooperate is DeLoach's attorney's request that the second Bever interview of DeLoach be at the DeLoach home rather than at the police station. *See* II R. 99–100. Apparently DeLoach, upon advice of counsel, also refused Bevers' request that she take a lie detector test. This was not before the jury, however.[2]

Bevers argues that she cannot be held responsible for DeLoach's arrest and prosecution because there were many interven-

---

**2.** There is nothing in the appellate record indicating that Bevers sought to introduce evidence of DeLoach's refusal to take a lie detector test as evidence relevant to the retaliation claim. On appeal Bevers does challenge the district court's refusal to permit evidence of polygraphs taken by Ryan's parents, the Swifts. She argues this was relevant, not on the issue of whether the Swifts committed the crime, but to support Bevers' belief that DeLoach had committed the crime and hence to support her filing of the affidavit that led to DeLoach's arrest. We uphold the district court's decision on the exclusion of the lie detector evidence. The firmness of Bevers' conviction about DeLoach's guilt, based upon the Swifts having passed lie detector tests is not relevant to, and does not justify, either retaliatory action against DeLoach or falsehoods or omissions in Bevers' affidavit to support an arrest warrant.

ing actors making independent determinations to arrest and prosecute: the district attorney's office, the magistrate issuing the arrest warrant, and the judge at the preliminary hearing. But there was evidence from which the jury could believe that Bevers manipulated the process by mischaracterizing the evidence and by concealing the exculpatory opinion of a key medical expert. Some time in October 1985, Bevers interviewed John H. Stuemke, M.D., Medical Director of Outpatient Department and Emergency Services for Children's Hospital, an expert in child abuse who was often consulted by the district attorney's office and who had testified for the prosecution in many cases.[3] Dr. Stuemke's opinion was that it was much more likely that one of Ryan's parents had rendered the fatal blow than DeLoach, and that the blow could have and probably did occur twenty-four hours or more before the child became comatose. Yet, Bevers did not make an investigative report of this interview to be included in the investigation file for use by the district attorney's office, apparently the only interview she did not record. She also did not report Dr. Stuemke's opinion in her affidavit supporting the arrest warrant. Because Bevers admitted that she knew exculpatory evidence in her file was required to be made available to a defense attorney, *see* IV R. 557–58, the jury could believe her failure to make a record of this interview or to mention it later was deliberate. When Bevers testified at the preliminary hearing, she completely mischaracterized the substance of the interview and Dr. Stuemke's opinion, avoiding any exculpatory implications. When the district attorney's office consulted Dr. Stuemke shortly before DeLoach's trial, it was his opinion that convinced them to dismiss the charges against DeLoach. Indeed, Assistant District Attorney Deason testified that if Dr. Stuemke's opinion had been known before DeLoach's arrest, she would not have been arrested. II R. 169.

In *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir.1988), the court stated:

"[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision.

... If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute.... They cannot hide behind the officials whom they have defrauded."

*Id.* at 994 (citations omitted). Likewise, Bevers cannot hide behind the decisions of others involved in DeLoach's arrest and prosecution if she deliberately conceals and mischaracterizes exculpatory evidence.

II

■ DeLoach alleged that Bevers violated her Fourth Amendment rights by causing her to be arrested pursuant to an intentionally false and misleading affidavit. Bevers contends that she is entitled to qualified immunity under the doctrine of *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). In *Malley*, qualified immunity in § 1983 actions was equated with the good-faith exception to the exclusionary rule laid down in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). *Malley*, 475 U.S. at 344, 106 S.Ct. at 1097. *Leon* reaffirmed the doctrine of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), that a warrant must be voided "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Leon*, 468 U.S. at 923, 104 S.Ct. at 3421. Thus, "[w]here the judicial finding of probable cause is based solely on information the officer knew to be false or would have known to be false had he not recklessly

---

**3.** There was conflicting testimony over whether Assistant District Attorney Deason was also present for this interview, but Deason testified that he had no knowledge of the interview. II R. 163.

disregarded the truth, not only does the arrest violate the fourth amendment, but the officer will not be entitled to good faith immunity [under § 1983]." *Olson v. Tyler,* 771 F.2d 277, 282 (7th Cir.1985). A reckless disregard for the truth exists when "the affiant 'in fact entertained serious doubts as to the truth of his' allegations, ... [and] a factfinder may infer reckless disregard from circumstances evincing 'obvious reasons to doubt the veracity' of the allegations." *United States v. Williams,* 737 F.2d 594, 602 (7th Cir.1984) (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731–32, 88 S.Ct. 1323, 1325–26, 20 L.Ed.2d 262 (1968)), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). The *Franks* rule applies to omissions as well as affirmative misstatements, if the omissions are so probative they would vitiate probable cause. *Stewart v. Donges,* 915 F.2d 572, 582 n. 13, 583 (10th Cir.1990). Recklessness may be inferred from omission of facts which are "clearly critical" to a finding of probable cause. *Hale v. Fish,* 899 F.2d 390, 400 (5th Cir.1990); *United States v. Reivich,* 793 F.2d 957, 961 (8th Cir.1986).

There was evidence from which the jury could conclude that Bevers made intentional or reckless misstatements in her arrest affidavit. The third paragraph of the affidavit stated "[t]hat the defendant made statements to the affiant that the child had fallen on a toy Tonka truck and this was the injury to the forehead and the left ear. These statements are inconsistent with the type and magnitude of the injury found by the doctors." Addendum to Appellant's Brief in Chief, tab 5. DeLoach's testimony, as well as a transcribed interview of DeLoach by Bevers, revealed, however, that DeLoach merely offered this incident as the only instance on September 11 she could recall where Ryan could have sustained any injury while in her care.

Paragraph five of the affidavit included the following: "And further statements made by CAMILLE MEYER DELOACH to the affiant were that she had found the child not breathing and that she had administered CPR, and after getting the child to breathe failed to contact emergency assistance while waiting approximately 15–20 minutes for the mother to arrive to pick the child up." *Id.* But DeLoach's transcripted interview with Bevers and Bevers' report of her initial interview with DeLoach both reveal that the child was breathing and this was an exaggeration of the amount of time DeLoach said passed between resuscitation and the arrival of Mrs. Swift. *Id.* tab 6, at 1 (transcript of interview on 10–8–85) ("He was just real lethargic, and just breathing shallow so I gave him mouth to mouth and he seemed to pick up his breathing and then she arrived and we called the ambulance."); *id.* tab 2, at 2 (defendant's report of interview on 9–12–85) ("She stated that ... she checked on Ryan and found him not to be breathing very much and at this time attempted to administer CPR. A few minutes later, Mrs. Swift came to pick up Ryan and it was at that time that the ambulance and the Fire Dept. were called.").

Paragraph four of the affidavit provided as follows:

"From further investigation by the affiant and interviews with Dr. Polk who was the treating neurologist on the case, Dr. Polk told this affiant that he performed a craniotomy and that Ryan T. Swift suffered an acute injury from a blow to the head. Dr. Polk and Dr. Cagle both related to the affiant that the victim, Ryan T. Swift would have immediately gone into unconsciousness. Dr. Cagle was the assisting neurologist in the case and was present during the craniotomy. Both Dr. Polk and Dr. Cagle told the affiant that the injury had to be one of a non-accidental nature."

*Id.* While all this information is true, Bevers failed to set forth the opinion shared by the medical examiners and Dr. Steumke that the fatal blow could have been rendered more than a day before Ryan became unconscious, even though Bevers did relate that the medical examiners had ruled the death a homicide. Bevers also excluded all reference to autopsy findings of many bruises of varying ages covering the infant's body.

Not all errors and omissions will negate probable cause, of course, and not

all evidence known to the officer need be included in every affidavit used to secure an arrest warrant. But in the case of omitted evidence it is not enough to ask simply whether the truthful statements included in the affidavit are by themselves sufficient to support a probable cause finding; the court also must ask if inclusion of the omitted material would negate probable cause. Thus, in *Stewart* we held that failure to disclose in an affidavit that the main complainant had recanted his testimony "would be a reckless omission of a material fact in violation of plaintiff's clearly established rights because the affidavit would not support probable cause if it were modified so as to include that exculpatory evidence." 915 F.2d at 583. In *Hale,* the Fifth Circuit found an officer's failure to mention "information garnered from a number of witnesses which tended to contradict [the officer's] allegations" to fall into the "clearly critical" category. 899 F.2d at 400. In the instant case, the fact that the prosecution reposed great confidence in Dr. Stuemke's opinion, evidenced by his frequent use as an expert witness for the prosecution and that the district attorney dropped the charges upon learning Dr. Stuemke's views, is strong evidence that probable cause would have been vitiated had Dr. Stuemke's views been incorporated in the affidavit of probable cause.

We have long recognized that it is a jury question in a civil rights suit whether an officer had probable cause to arrest. *E.g., Stringer v. Dilger,* 313 F.2d 536, 541 (10th Cir.1963); *Marland v. Heyse,* 315 F.2d 312, 314 (10th Cir.1963).

"It is true that the issue of probable cause ordinarily is for the judge rather than the jury. That is because the issue usually arises in the context of a motion to suppress evidence, which the judge decides. But where the issue arises in a damage suit, it is, as the panel opinion acknowledged, a proper issue for the jury if there is room for a difference of opinion. The underlying issue in deciding whether the police had probable cause to do what they did is reasonableness, which is also the underlying issue

in deciding negligence—a classic jury issue."

*Llaguno v. Mingey,* 763 F.2d 1560, 1565 (7th Cir.1985) (en banc) (citations omitted) (probable cause to search). This rule applies also to cases in which the officers made the misrepresentations in an application for an arrest warrant. *Easton v. City of Boulder,* 776 F.2d 1441, 1448 (10th Cir. 1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986); *see also Malley v. Briggs,* 475 U.S. 335, 341 & n. 4, 106 S.Ct. 1092, 1096 & n. 4, 89 L.Ed.2d 271 (1986).

Based upon Bevers' own admissions on cross-examination at trial, the jury could believe the misstatements and omissions in the affidavit were deliberate. *See* IV R. 580–85. The alleged misstatements and omissions in this case clearly were material enough that the district court was justified in submitting the question of probable cause to the jury.

### III

Bevers challenges several jury instructions and the district court's failure to give other instructions. As to most of these, Bevers made no objection at trial, so the challenges must be judged by a plain error standard. After carefully reviewing defendant's objections in light of the instructions and the record as a whole, we believe the instructions gave the jury ample understanding of the issues and applicable standards, and Bevers was not prejudiced by any particular instruction. *See Big Horn Coal Co. v. Commonwealth Edison Co.,* 852 F.2d 1259, 1271 & n. 19 (10th Cir.1988).

The only issue that Bevers has raised and that concerns us regarding the award of punitive damages is her claim for remittitur on the basis that the sum of $75,000 is three times Bevers' net worth. She correctly points out that such damages are to punish and not to bankrupt a defendant against whom they are awarded. *See Thiry v. Armstrong World Indus.,* 661 P.2d 515, 518 (Okla.1983). The only argument made to the district court in Bevers' motion for remittitur and brief in support, however, was that "there was no evidentuary [sic] basis for the jury to conclude that

Plaintiff was entitled to an award" of $75,-000, and that the award "is so overly punitive as to suggest the jury was swayed by passion and prejudice and did not take into consideration evidence of Defendant's assets and net worth." I R. tab 144 at 1. Both are all-or-nothing arguments, not focused specifically on Bevers' ability to pay. The jury did have evidence of Bevers' net worth; but it was not permitted to consider whether Bevers had insurance coverage. If, as now claimed on appeal, insurance does not cover the punitive damages award, that information should have been presented to the district court in support of the remittitur motion. Because Bevers failed to make such an argument to the district court, we will not consider it on appeal.

This is a tragic case. Bevers admitted that she made up her mind that DeLoach, the babysitter, was guilty of murder shortly after her first interviews with the three principal suspects—DeLoach and the child's parents. She apparently never waivered from that belief, and a jury could believe it very much affected her actions thereafter: that she took DeLoach's hiring of a lawyer as evidence of guilt; that she did not pay attention to Dr. Stuemke's opinions because the doctor did not agree with her views (Dr. Stuemke testified to that effect); that she deliberately failed to record Dr. Stuemke's views to prevent the defense lawyer from obtaining that exculpatory information; and that when the district attorney decided to file the case and Bevers was asked to prepare an affidavit, she deliberately slanted the facts by misstatements and omissions to help persuade the magistrate to issue the warrant. The amicus briefs are alarmed that upholding the verdict against Bevers will chill future law enforcement officers. But accepting the jury's findings as true, what Bevers did is totally unacceptable behavior for an investigative officer. Impelled by her own bias to slant the evidence, she improperly hindered the others whom the law supposes will make impartial determinations—the district attorney and the magistrate—before DeLoach is required to undergo the ordeal of arrest and trial for first degree murder.

AFFIRMED.