EMILIO M. GARZA, Circuit Judge,
dissenting:
I would affirm the district court. Much about this case is disputed. If the evidence is viewed in the light most favorable to the nonmovant, Mendenhall, there are material issues of fact precluding summary judgment.
Mendenhall raises two claims under § 1983, based on his false arrest for William Myles’s murder. The first is that a reasonable officer would not have believed that probable cause existed to arrest him. See Hunter v. Bryant, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991); Babb v. Dorman, 33 F.3d 472, 477 (5th Cir.1994). The second is that the arresting officers knowingly or recklessly submitted a false and misleading affidavit to obtain his arrest warrant. See Franks v. Delaware, 438 U.S. 154, 171-72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); Hale v. Fish, 899 F.2d 390, 400-02 (5th Cir.1990). Material fact issues remain as to both claims.
Mendenhall was arrested the day of Myles’s shooting, September 13, 1996. While the investigation at the scene of the shooting appears to have been the basis for Mendenhall’s murder arrest,[1] the eyewitness testimony that emerged did little to provide probable cause for that arrest. Deputy Ashley claims that two anonymous witnesses at the scene identified Menden-hall as the shooter. Specifically, his written report states that the two witnesses had “said that John Mendenhall had shot the deceased in the head.” However, in deposition Ashley admitted that neither witness even saw Mendenhall fire a weapon.[2] Deputy Cropper, who arrived soon *238 after Ashley, interviewed approximately ten witnesses, all of whom apparently provided him their names.[3] Pressed in his deposition, Cropper, who actually prepared the arrest affidavits and obtained the warrant, admitted that prior to Mendenhall’s arrest no witness had told him that Men-denhall had fired a gun, let alone shot Myles.[4]
The officers claim that Pamela Neal also identified Mendenhall as the shooter. In her deposition, Neal claims that she not only did not identify Mendenhall as the shooter, but that she informed the deputies that a man in a green car, not Men-denhall, shot Myles. The majority “disregard[s] the controversial identification” from Neal, but on summary judgment we are required to affirmatively consider the evidence in the light most favorable to Mendenhall. Neal’s deposition testimony is not contradicted by her written statement, which does not identify Mendenhall as the shooter or even state that Menden-hall fired his gun. Therefore, viewing the evidence favorably to Mendenhall, we are required to credit Neal’s testimony that she informed the officers that a man in a green car, not Mendenhall, shot Myles. While Neal’s credibility may have been questionable, her statements would reasonably have pointed toward further investigation, prior to Mendenhall’s arrest, into other possible suspects.[5]
Therefore, the summary judgment record suggests that the alleged eyewitness testimony pointing to Mendenhall as the shooter is extremely weak. The other information on which the majority relies to find that a reasonable officer could have found probable cause to arrest Mendenhall is, to me, equally underwhelming. It is reasonably explained by the undisputed fact that Mendenhall was a police officer on the scene pursuing a dangerous criminal at the behest of Cullen Officer 'White.[6]
The officers did not have a suspected murder weapon in their possession at the time of Mendenhall’s arrest. The majority notes that two spent nine-millimeter shell casings were found at the scene and that Mendenhall was thought to have had a nine-millimeter pistol. This information would have justified the officers in seeking a search warrant for Mendenhall’s pistol.[7] *239 However, the officers had not even obtained such a warrant at the time they obtained the arrest warrant for Menden-hall, let alone performed the requisite ballistics tests on the pistol.[8] The fact that Mendenhall, a policeman, was suspected‘of having a nine-millimeter did little to provide probable cause to arrest him for the murder of Myles,
The majority also notes that Mendenhall handled Myles’s weapon at the crime scene. Mendenhall’s uncontested testimony is that he picked up Myles’s gun to *240 make sure that there were no live rounds still in the gun. Mendenhall removed the shells from the gun and, seeing that there were no live bullets, rechambered the empty shell casings. The summary judgment record does not establish that, as a police officer faced with stressful, violent and chaotic circumstances,[9] Mendenhall’s conduct was unusual, let alone suspicious.[10] Therefore, a fact issue remains as to whether that conduct provided any cause for arresting him for Myles’s murder.
Perhaps the biggest flaw in the officers’ brief pre-arrest investigation was their failure to adequately examine Officer White. White and Mendenhall have provided consistent testimony as to the events at the crime scene. The appellants have not expressly claimed that this testimony is false; even if they had, on summary judgment, we are required to credit it. According to White and Mendenhall, White was the first police officer at the scene, Mendenhall the second. White sent Mendenhall to Lee Street to pursue Myles, while White completed the arrest of two suspects. When White subsequently arrived on Lee Street, Mendenhall told White that Ted Nelams shot Myles in self-defense. White gave Mendenhall permission to leave the scene, to check on Deon Grisby at the hospital.
Yet, while White apparently led the Webster Parish investigators to the scene of Myles’s death, they did not ask White any questions about what had happened.[11] The investigators took over the crime scene and immediately dispatched White to investigate an auto accident. White complied, albeit unhappily.[12] Later, Deputy Null apparently spoke to White, but it does not appear that White was asked about Mendenhall’s role in the incident.[13] Cropper confirmed that he did not ask White why Mendenhall was at the crime scene, and was not aware of any such inquiry by any of his colleagues, prior to seeking the arrest warrant. Clearly, a reasonable policeman would have thoroughly examined White before seeking an arrest warrant against Mendenhall, a fellow policeman. Mendenhall explained his subsequent silence to the investigating officers by noting that 1) he answered questions until the officers were asking only whether he had shot Myles, not whether he had any information about the crime;[14] 2) he was shocked that he was considered a suspect; and 3) he did not wish to answer these particular questions without an attorney present. Mendenhall’s explana *241 tion is buttressed by the officers’ apparent treatment of White and by the entire tenor of the investigation that preceded Menden-hall’s arrest. Reading the summary judgment record favorably to Mendenhall, it appears that he could reasonably have believed that the officers had unfairly fixed upon him, that they would not have considered information he could have provided pointing away from him or toward another shooter, and therefore that there was no point in speaking to the investigators without an attorney.[15] Such a silence would not provide probable cause for his premature arrest.[16]
I recognize that probable cause is assessed not by any individual factor, but by the totality of the circumstances. See Illinois v. Gates, 462 U.S. 213, 241, 103 S.Ct. 2317, 76 L.Ed.2d 627 (1983). I also recognize that, to have qualified immunity, the defendants need only have had a reasonable belief, at the time of arrest, that probable cause existed. See Hunter, 502 U.S. at 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). However, probable cause exists only if, at the time of arrest, “the facts and circumstances within [the arresting officers’] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing” that Mendenhall had committed second degree murder. Id. at 228, 112 S.Ct. 534. Reading the summary judgment record in the light most favorable to Mendenhall, I am unprepared to conclude that a prudent Webster Parish officer, possessing only the limited and equivocal information that had been produced by a brief investigation targeted at Mendenhall, could reasonably have believed at the time of arrest that Mendenhall was guilty of second-degree murder. Therefore, I disagree with the majority’s premature conclusion that, as a matter of law, a reasonable officer in Cropper’s shoes could have concluded that probable cause existed for Mendenhall’s arrest for the murder of Myles.
Mendenhall’s second claim is that the affidavit used to arrest him contained material misstatements or omissions that were made recklessly or intentionally. We have also required, to show a constitutional violation sufficient to overcome qualified immunity, that: 1) the misstatements or omissions have been “of such character that no reasonable official would have submitted it to a magistrate”; and 2) that the misstated or omitted facts be “clearly critical” to a finding of probable cause, such that probable cause would not exist without them. See Hale, 899 F.2d at 400-02; Morin v. Caire, 77 F.3d 116, 122 (5th Cir.1996).
The affidavits submitted to the magistrate by Cropper to obtain an arrest warrant for Mendenhall read:
On the morning of September 13, 1996, approximately 7:30 A.M. a homicide occurred in the middle of the street, in front of 427 Lee Street, Cullen, Louisiana. Witnesses state that they observed John Mendenhall, black/male, pull a weapon, assault-style, from his *242 vehicle, chase on foot, fire a shot in the direction of the victim then place the weapon back inside his vehicle, and leave the scene. John Mendenhall was contacted by law enforcement, asking him to make a formal statement and turn over the weapon, but refused. [Search Warrant Affidavit]
[To the best of my knowledge and belief, Mendenhall] did commit in the following manner an offense contrary to law by chasing a black/male by the name of William D. Myles, down Lee St. Cullen, Louisiana, armed with a 9 mm pistol, then firing the 9 mm pistol, striking William D. Myles in the back of the head, causing death. After shooting William D. Myles put the 9 mm pistol back into his vehicle, then leave the scene, before talking to Investigating Officers. John Mendenhall had specific intent to inflict bodily harm. Therefore violating L.R.S. 14:30.1, Second Degree Murder. [Arrest Warrant Affidavit][17]
A number of facts apparently material to the magistrate’s probable cause determination were omitted from these affidavits. Cropper did not note that Menden-hall was an off-duty police officer who had been asked by White to help him apprehend Myles. Nor did Cropper explain that Myles was a dangerous criminal who had been firing his gun as he fled the scene of a shooting. Nor, finally, did Cropper note that the relevant witnesses were anonymous, and that a substantially larger number of witnesses did not state that Mendenhall shot Myles.
The summary judgment record also suggests that certain statements in the affidavits were false. In the search warrant affidavit, Cropper claims that “witnesses” provided a vivid picture of Mendenhall pulling a gun and firing it at Myles. However, Cropper himself admitted that, at the time of arrest, no witnesses had told him Mendenhall even fired at all. Ashley, whose anonymous witnesses provided the only purported testimony that Mendenhall killed Myles, also admitted that those witnesses did not see Mendenhall shoot. Therefore, the key factual statement in the affidavit was, the summary judgment record suggests, false.
The arrest warrant affidavit consists entirely of conclusory allegations.[18] With the exception of the statement that Menden-hall left the scene without speaking to investigators, it also appears false. Men-denhall did not fire his pistol, did not shoot Myles, and did not commit second-degree murder.
It appears that the material misstatements and omissions were “clearly critical” to the existence of probable cause.[19] Re *243 moving the misstatements would, in essence, leave only the fact that Mendenhall did not speak to investigating officers. This fact alone is insufficient, as Deputy Null admitted, to provide even arguable probable cause for Mendenhall’s arrest.
The omitted information regarding the witnesses, notably their anonymity and that they did not see Mendenhall fire his weapon, also appears to have been critical. Likewise, as I have discussed, the omitted circumstances surrounding Mendenhall’s conduct, if included, might have defeated the existence of probable cause for his murder arrest. Therefore, the omitted information also appears to have been “clearly critical” to the finding of probable cause.
The only remaining question is whether, on summary judgment, we are prepared to conclude as a matter of law that 1) the misstatements and omissions were neither intentional nor reckless; or that 2) the misstatements and omissions were not of such a character that a reasonable officer would not have submitted the magistrate. See, e.g., Hale, 899 F.2d at 400-02. Reading the evidence in the light most favorable to Mendenhall, I am not prepared to draw either conclusion. As to the misstatements, the officers knew what the witnesses told them. Rather than present what they were told, they apparently mis-characterized the witnesses’ statements. They then relied almost entirely on those apparent mischaracterizations and on con-clusory statements in seeking an arrest warrant, rather than presenting the facts they did have. In the absence of the apparent misstatements, at the very least a fact issue remains as to whether the affidavit approached a showing of probable cause, and therefore as to whether any reasonable officer would have submitted such an affidavit in search of an arrest warrant. See Malley v. Briggs, 475 U.S. 335, 344, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (“Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost.”) (internal citation omitted). As to the omissions, we have held that when the omitted facts are “clearly critical” to a finding of probable cause, recklessness can be inferred from proof of the omissions themselves. Hale, 899 F.2d at 400.
Therefore, I disagree with the majority’s decision to grant summary judgment to the defendants based on qualified immunity. I would affirm the district court’s denial of summary judgment.

. The majority notes that the "investigators’ focus soon shifted to Mendenhall, as two witnesses identified him as the shooter." It is unclear what further investigation, other than the contested discussions with Pamela and Gertie Neal and with Mendenhall, preceded the seeking of the arrest warrant against Men-denhall.

. When asked if the anonymous witnesses testified "[t]hat they didn’t actually see him shoot, but he was out there with a gun,” Ashley responded, "Correct.”
The majority argues that Ashley’s clarification is no way affects the credibility of his statement that the two witnesses said that Mendenhall had shot Myles in the head. The record speaks for itself. I believe jury members might reasonably disagree, finding the explanation that the witnesses said that they saw only Mendenhall with a gun at the scene of the shooting to differ materially from the statement that the witnesses said they saw Mendenhall shoot Myles. More generally, the *238 existence of a reasonable disagreement with regard to Ashley’s testimony, among other material aspects of the record, itself indicates that summary judgment is inappropriate.

. It is difficult to believe that the officers could not obtain names from the only two eyewitnesses who "saw" Mendenhall shoot Myles, especially as Cropper obtained names from each of ten witnesses who did not see this, as well as written statements from Neal, Belinda Harris, and Dexter Turner. At the very least, the anonymous nature of Ashley’s witnesses renders them less worthy of reliance.

. Cropper stated that Monica King was the only witness to tell him that Mendenhall had fired and Cropper did not interview King until after Mendenhall's arrest.

. The majority states that the dispute over Neal’s testimony is immaterial. To the extent to which the majority concludes, even if we accept that Neal informed the officers that 1) Mendenhall was not the shooter, and 2) a man in a green car was the shooter, a reasonable officer nevertheless would have believed probable cause for Mendenhall's arrest existed, I disagree. The unreasonable shallowness of the investigation preceding Mendenhall’s arrest is exacerbated if we assume, as I believe we must, that Neal pointed to another man. As it turned out, Neal’s alleged statements were accurate: the man in the green car was Ted Nelams, the shooter.

. Two witnesses, Belinda Harris and Dexter Turner, gave statements to the investigating officers in which they affirmed that at least six shots were fired in the course of the pursuit of Myles. Echoing Neal, Turner added specifically that he saw Myles shooting a gun as he ran through the streets.

. The majority claims that, by acknowledging that the officers could reasonably have sought a search warrant for Mendenhall’s nine-millimeter pistol, I have acknowledged that they also acted reasonably in arresting Mendenhall for murder. I disagree.
To support the proposition that probable cause to search for Mendenhall’s pistol and probable cause to arrest Mendenhall for murder are coterminous, the majority cites United States v. Brouillette, 478 F.2d 1171, 1178 (5th *239 Cir.1973) ("It is well recognized that the probable cause required to justify a search warrant is coextensive with the probable cause required to justify an arrest warrant.”). We have never repeated this statement or cited Brouillette for this proposition. Moreover, Brouillette is readily distinguishable. In Brouillette, we held that federal officers must, to obtain a search warrant for a suspected house of prostitution, show probable cause for believing that an offense had been committed. See id. at 1176-77. We held that the search warrant at issue was invalid for failure to show probable cause. See id. at 1177. To support that conclusion, we stated that no arrest warrant, for any crime, could have been obtained. See id.
Therefore, in Brouillette we did not find that the existence of probable cause for a search warrant of an item suspected of use in a crime established probable cause for an arrest warrant. Rather, we held the converse: that the absence of probable cause for an arrest warrant, due to the lack of a showing that a crime had occurred, indicated the absence of probable cause for a search warrant. See also Giordenello v. United States, 357 U.S. 480, 485-86, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958) (stating that the Fourth Amendment applies to both arrest and search warrants, and ultimately invalidating an arrest warrant for lack of probable cause) (cited in Brouillette).
Therefore, Brouillette does not establish that probable cause to search for Menden-hall’s pistol was coterminous with probable cause to arrest Mendenhall for Myles's murder, and under the circumstances I believe the two were not coterminous. Probable cause for a search warrant does not require probable cause to arrest the person whose property is to be searched. See United States v. Melvin, 596 F.2d 492, 496 (1st Cir.1979); Zurcher v. Stanford Daily, 436 U.S. 547, 554, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."). "[Wjith respect to a person who the police do indeed suspect but do not have probable cause to arrest, such a person’s property may be searched upon probable cause to believe that fruits, instrumentalities, or evidence of crime are present, even though the products of the search may implicate him.” Melvin, 596 F.2d at 496. In Melvin, the First Circuit found that there was probable cause to search Melvin's property for instrumentalities or evidence of a crime based on an affidavit providing a reasonable suspicion that Melvin had committed the crime, even though that affidavit did not provide probable cause to arrest Melvin. See id. at 496-97 (noting that a contrary holding would "render property searches ineffective as tools of criminal investigations in many cases”). See also United States v. Rojas, 671 F.2d 159, 165 (5th Cir.1979) ("[T]he facts necessary to show probable cause to arrest are not necessarily the same as those required to show probable cause to search.") (citing Melvin).
In this case, as in Melvin and not Brouil-lette, it is clear that a shooting had occurred. Mendenhall had been placed at the scene with a gun. Mendenhall was suspected of having a nine-millimeter pistol and two nine-millimeter shell casings had been recovered at the scene. Obtaining and testing Mendenhall's weapon would have resolved the question of whether Mendenhall’s weapon had been fired and, if it had, whether it was the weapon used in the shooting. Cf. Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 307, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (holding that government may search for “mere evidence” of a crime and that "in the case of 'mere evidence,’ probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction”); Rojas, 671 F.2d at 165 ("[Pjrobable cause to search exists when facts warrant a reasonable person to believe that the objects sought in connection with a crime will be found.") (internal citation omitted).

. The search warrant was obtained at the same time as the arrest warrant for Menden-hall. J. Schuyler Marvin, the Webster Parish assistant district attorney assigned to the case, testified that his office was not consulted pri- or to the arrest and that he would have preferred that the ballistics results been sought before the arrest warrant was obtained. The ballistics report exonerating Mendenhall was ultimately obtained just after the expedited preliminary examination.

. Asked whether there were people milling about the crime scene, Wayne Walsh noted that "there were people all over” and that Mendenhall, the only policeman on the scene, was "providing crowd control.”

. The majority notes that Mendenhall admitted to certain technical errors at the crime scene. There is evidence in the record, however, that these errors were not rare and that in other instances they gave rise to little concern, let alone suspicion of criminal activity on the part of the officer.

. Mendenhall later returned to the crime scene. Ashley and Deputy Shaw both stated that they saw him there. But no investigator talked to Mendenhall at the scene.

. White was displeased that, even though he was the police officer in charge, as soon as he led the investigators to the scene, they left without questioning him to speak to the ambulance personnel. White was equally dismayed that the investigators then dispatched him to the auto accident, which he claims was outside his jurisdiction. With reference to the crime scene, he stated, “I didn’t relinquish it; they took it ... That was my crime scene and they took it ...” He concluded that the investigators "ignored me. They treated me like I was nothing.” Adding that "[tjhey ain't asked me nary a question, not one,” White stated that he did not volunteer information because the investigators would not have listened to him.

. White's deposition testimony suggests that the discussion with Null occurred after the arrest warrant for Mendenhall was issued, but this is not clear.

. As the majority notes, Mendenhall apparently told Deputy Newton that his gun had jammed. In the meeting at the station-house, Mendenhall reiterated that he had not shot Myles.

. As the majority notes, after eight years in the Webster Parish Sheriffs Office, Menden-hall apparently was discharged by Sheriff Riser when Riser took office in June 1996. Men-denhall had been convicted of burglary in Houston in 1987 or 1988. The record clearly suggests enmity between Mendenhall, who is black, and a number of the investigating officers from the Sheriff's Office, all of whom are white. Mendenhall was running for Cullen Police Chief, and the election was to be held on September 21. Cullen is the third-largest city in Webster Parish. After his arrest, Men-denhall, a Cullen native, an NFL Hall of Fame nose tackle and, allegedly, a local hero, narrowly lost the election. The expedited preliminary hearing was not held until September 23.

. While remaining silent, Mendenhall apparently stated at the station-house that, if given until Monday, he would provide the evidence he had regarding the shooting. Mendenhall’s offer highlights the prematurity of his arrest by suggesting that 1) there was no legitimate rush to take him into custody, and 2) the officers were more interested in arresting Mendenhall than in learning what really happened.

. While the first affidavit is technically in support of the application for a search warrant, and the latter an arrest warrant, the two affidavits were apparently submitted together and were both before the magistrate when he decided to grant the arrest warrant. Appellants’ claim that both affidavits should be considered together therefore seems reasonable.

. To the extent to which this section instead gives the impression that Cropper had firsthand knowledge to support the statements made, Cropper has admitted that impression was false. Cropper did not witness any of the events described in the affidavits. He did not tell the magistrate this, however.

. The officers have alleged that Cropper engaged in a phone conversation with the magistrate, and provided a number of facts that supplied a basis, beyond the affidavits, for the issuance of the warrant against Mendenhall. However, the officers have not alleged any specifics about what was said, or provided evidence to support their claim that the magistrate did not rely on the affidavits. The only record evidence on the point is Deputy Jimmy Morgan's testimony that he heard Cropper tell the judge that "some of the people up there had told them that John shot him.” Morgan could not recall anything else Cropper told the judge; clearly his testimony does not suggest that Cropper’s phone statements provided probable cause for Mendenhall’s arrest. Therefore, at least in the context of a summary judgment motion against Menden-hall, we must assume that the affidavits were the sole evidence before the magistrate. See United States v. Jackson, 818 F.2d 345, 350 (5th Cir.1987) ("Our review is limited to the affidavit itself because the government pre *243 sented no evidence to the district court to indicate whether other facts may have been before the magistrate and considered by him in his determination of probable cause.''); Hale, 899 F.2d at 401 (rejecting claim that other information not in affidavit was provided to magistrate because "Major Jones does not state the substance of this information and cites no place in the record where it may be found.”).