REVISED - June 20, 2000

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-30158
_____


JOHN MENDENHALL,

                                    Plaintiff-Appellee,

                         versus

THEODORE RISER, JR., individually and in his official capacity
as Sheriff of Webster Parish;
STEVE CROPPER, individually and in his official capacity as
Webster Parish Deputy Sheriff;
JAMES BELL, individually and in his official capacity as
Webster Parish Deputy Sheriff;
ALVA NULL, individually and in his official capacity as
Webster Parish Deputy Sheriff;
WAYNE NEWTON, individually and in his official capacity as
Webster Deputy Sheriff,

                                    Defendants-Appellants.

_____

        Appeal from the United States District Court
           for the Western District of Louisiana
_____
                    May 30, 2000

Before JOLLY, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

     Appellants appeal from the district court's order denying

their Motion for Summary Judgement, seeking dismissal of appellee

John Mendenhall's § 1983 civil rights complaint on the basis of

qualified immunity.  Because we determine that the officers acted

reasonably in arresting John Mendenhall for the crime of murder, we reverse the district court and grant appellants qualified immunity on all claims asserted by Mendenhall.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On a fateful Friday the Thirteenth in September of 1996, William Myles attempted to rob Deon Grisby in Cullen, Louisiana. Early that morning, sometime around 7 a.m., Myles and several purported members of a drug gang accosted Grisby while he was inside his girlfriend's home, in what is presumed by all parties involved to be a drug-related transaction.  When Grisby refused to turn over a sum of money on demand, Myles and his cohorts forced Grisby into the car they were driving.  As they began to drive off, however, Grisby attempted to escape by leaping from the moving vehicle.  His efforts to flee were met with gunfire. He was shot several times, as the would-be kidnappers took flight.

The exact sequence of these chaotic events is unclear, but somehow, perhaps in response to a call for help, Cullen Police Officer Jimmy Wayne White, appellee Mendenhall's half brother, arrived shortly thereafter, in time, remarkably, to apprehend two of the renegade gang.  Due to this fortuitous arrival of the cavalry, Grisby was rushed to the hospital and his life was saved.  Myles, in the meantime, escaped on foot, in the direction of Lee street.

Perhaps even more notable than his brother's timely

appearance at the scene of this shooting, John Mendenhall also arrived moments later, dressed in his police officer's uniform, apparently on his way home from work.[1] Upon consultation with Officer White, Mendenhall gave chase to Myles.

Mendenhall was not the only individual in pursuit early that morning. Several other individuals led a small procession in the chase after Myles. Mendenhall, driving his red pickup truck, fell in behind them.

It is at this juncture that the exact sequence of events is somewhat unclear from the record. Nonetheless, one indisputable event occurred: Near the corner of Lee Street and Boucher Extension, Myles was killed instantly from a single gunshot wound to the back of the head by someone in the group that gave chase. It is the events subsequent to this shooting that give rise to this appeal.

Medical personnel arrived on the scene shortly after Myles was shot, followed by Officer White accompanying Deputy Shaw and Deputy Ashley. Sometime shortly thereafter, Mendenhall simply left the scene. Deputies Cropper and Null, both appellants in

---

[1] John Mendenhall served as a deputy sheriff in Webster Parish for several years prior to the events that give rise to this dispute. His tenure apparently ended upon the swearing in of appellant Sheriff Riser in June of 1996. Sheriff Riser, as he stated in depositions taken in relation to this lawsuit, apparently dismissed Mendenhall out of concern for his criminal record. Following his dismissal in Webster Parish, Mendenhall secured employment as a police officer in Haynesville, in neighboring Claiborne Parish, although he maintained his residence in Cullen, Webster Parish.

this matter, were notified and dispatched to the scene as lead investigators.  Upon their arrival, they began in earnest the investigation of the presumed homicide.

The investigators' focus soon shifted to Mendenhall, as two witnesses at the scene identified him as the shooter.  In an effort to obtain his statement, appellant Deputy Newton visited Mendenhall at his home, requesting that he return to the Webster Parish Sheriff's Office sub-station in Springhill.  While it does not appear that Mendenhall immediately complied with this request, he did later make an appearance at the sub-station.  He was greeted by appellant-deputies Steve Cropper, Alva Null, Jim Bell, and Wayne Newton.  The deputies mirandized Mendenhall, and then proceeded to inquire as to the day's events.  Mendenhall, however, refused to cooperate.  He left the station shortly after arriving, and apparently reported to duty with the Haynesville Police Department.

Considering the information gathered from the day's investigation,[2] Deputy Cropper prepared a complaint-affidavit for

---

[2]The dissent expresses confusion concerning the nature and extent of the ensuing investigation, implying, in fact, that little investigation occurred at all.  Our reading of the record reveals an extensive investigation on the day of the murder, including: an on scene investigation of the crime, involving a full canvass of the neighborhood for any potential witnesses; further investigation at the hospital, where the victim of the first shooting was recovering; the questioning of witnesses identified at the hospital; follow-up investigation of the murder weapon, in an effort to determine whether Mendenhall owned a similar caliber weapon; later investigation at the scene, including follow-up interviews with eyewitnesses; a visit to Mendenhall's home, at which time his cooperation was requested; and an attempted

4

the arrest of John Mendenhall on charges of second degree murder in violation of Louisiana law.[3]  Using this affidavit, and another prepared for the purpose of obtaining a search warrant, Cropper sought and obtained a warrant for the arrest of John Mendenhall, as well as a search warrant for his home.  Upon issue, the arrest warrant was faxed to Mendenhall's place of employment, at which time he was stripped of his weapon and badge and placed into custody.  Upon being processed into the system, Mendenhall was locked in the Webster Parish jail, where he spent one night, before being released on bond the next day.

Upon release, Mendenhall sought and secured counsel.  A Motion for Expedited Preliminary Examination was filed on September 16 - a Monday - and the hearing was scheduled for the following Monday.  Mendenhall requested the expedited hearing out of concern for his candidacy in the upcoming election for Cullen Police Chief, to be held the following Saturday.  He was naturally worried about the impact of a pending murder trial on

---

interview with Mendenhall at the station house.

[3]Officer Cropper's affidavit in support of the arrest warrant stated in relevant part:
[To the best of my knowledge and belief], John Mendenhall . . . did commit in the following manner an offense contrary to law by chasing a black/male by the name of William D. Myles, down Lee St. Cullen, Louisiana, armed with a 9mm piston, then firing the 9mm piston, striking William D. Miles in the back of the head, causing death.  After shooting William D. Myles put [sic] the 9mm pistol back into his vehicle, then leave [sic] the scene, before talking to Investigating Officers. John Mendenhall had specific intent to inflict bodily harm. Therefore violating LRS 14:30.1 Second Degree Murder.

his chances in the election.  His concern may have been well founded, as Mendenhall subsequently lost the election.

At the hearing, Deputy Cropper testified as to the facts and circumstances supporting probable cause.  Mendenhall, in his defense, presented the affidavit of Ted Nellams, an individual indisputably at the scene of Myles' shooting, who claimed to have fired the fatal bullet.  The presiding judge, considering Nellams' affidavit, failed to find probable cause to bind Mendenhall over for trial as required under Louisiana law.[4]  The district attorney subsequently dismissed the prosecution against Mendenhall.

Mendenhall filed suit pursuant to 42 U.S.C. § 1983 nearly one year later, asserting that appellants violated his civil rights by falsely arresting him for the murder of William Myles. Each side respectively filed motions for summary judgment. Finding that "genuine issues of material fact remain in this matter" with respect to the claims made by each party, the district court denied summary judgment to all.  Appellants filed a timely notice of appeal concerning the failure of the district court to grant summary judgement on qualified immunity grounds.

## II. DISCUSSION

A.  Jurisdiction and Standard of Review

While no party contests our jurisdiction to hear this

---

[4]LSA-C.Cr.P. Art.296.

6

interlocutory appeal, we write briefly to note that, although denials of qualified immunity on summary judgment are not final orders, they are immediately appealable under the collateral order doctrine if based on an issue of law.  See Rodriquez v. Neeley, 169 F.3d 220, 222 (5th Cir. 1999) (citing Cantu v. Rocha, 77 F.3d 795, 802 (5th Cir. 1996); Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).

When as here the district court fails to make specific findings of fact or state specific conclusions of law, we will "undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the non-moving party, likely assumed."  Behrens v. Pelletier, 516 U.S. 299, 313 (1996).  In essence, we will give the plaintiff the benefit of the doubt with regard to any disputed issues of fact, in an attempt to reconstruct the district court's findings and conclusions, and thus review as a matter of law whether under such a factual scenario the § 1983 complaint may proceed.  See Colston v. Barnhart, 130 F.3d 96, 98-99 (5th Cir 1997).  If those facts do not materially affect the outcome - i.e., if even under such a factual scenario the officers' actions may be deemed as a matter of law objectively reasonable - the denial of summary judgment is immediately reveiwable as a question of law, and qualified immunity should be granted.  See Id. (citing Mitchell, 472 U.S. 511 (1985); Johnson v. Jones, 515 U.S. 304 (1995); Behrens v. Pelletier, 516 U.S. 299 (1996); Nerren v. Livingston

7

Police Dep't, 86 F.3d 469, 472 (5th Cir. 1996)).

Our review of the district court's order denying summary judgment on qualified immunity grounds is conducted *de novo*. See Nerren, 86 F.3d at 472 (citing Johnson v. City of Houston, 14 F.3d 1056, 1059 (5th Cir. 1994)).

B.  Probable Cause and Objective Reasonableness

It is, by now, well settled and understood that "[f]ederal immunity law shields state officials from personal liability under federal law for civil damages as long as their conduct could reasonably have been thought consistent with the rights they are alleged to have violated." Cantu, 77 F.3d at 805 (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987); Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)). Qualified immunity protects against novel theories of statutory or Constitutional injury - any purported harm must stem from rights clearly established under law at the time of the incident, and the contours of that right must be sufficiently clear such that a reasonable officer would understand that his actions were violative of the right at issue. See Anderson, 483 U.S. at 638-39. Thus, the qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 343, 341 (1986).

When an individual asserts a claim for wrongful arrest, qualified immunity will shield the defendant officers from suit

8

if "'a reasonable officer could have believed [the arrest at issue] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.'  Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (quoting Anderson, 483 U.S. at 641); see also Babb v. Dorman, 33 F.3d 472, 477 (5th Cir. 1994).  "Thus, a qualified immunity defense cannot succeed where it is obvious that a reasonably competent officer would find no probable cause.  On the other hand, 'if officers of reasonable competence could disagree on this issue, immunity should be recognized.'" Babb, 33 F.3d at 477 (quoting Malley, 475 U.S. at 341).

Thus armed, we turn to the facts of the case now before us. In essence, we must determine whether the facts, viewed in the light most favorable to Mendenhall, support a finding that no reasonable officer could have believed probable cause existed to arrest Mendenhall on charges of second degree murder in the shooting death of William Myles.  We note that our determination concerning probable cause is guided by the Supreme Court's mandate in Illinois v. Gates: We look to the totality of the circumstances to determine whether probable cause, or in this case arguable probable cause, existed.  462 U.S. 213, 241 (1983). We are mindful of the notion that "probable cause is a fluid concept - turning on the assessment of probabilities in

9

particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules." Id. at 232. Thus we embark on a "practical, common-sense [determination] whether given all of the circumstances" a reasonable officer could have believed "there is a fair probability" Mendenhall committed the crime charged. Id. at 238.[5]

Appellee repeatedly draws our attention to the Preliminary Examination, conducted some 10 days after his arrest, in an effort to demonstrate the purported lack of probable cause in this case. While we recognize that the state judge failed to find probable cause at the Preliminary Examination hearing, we reject the notion that this finding bears any relevance to our task in resolving this appeal. The law charges us with determining the reasonableness of the actions taken in light of the cause that existed *at the time of arrest*. See Hunter, 502 U.S. at 228 (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)) ("Whether [an] arrest [is] constitutionally valid depends in turn upon whether, *at the moment the arrest was made*, the officers had probable cause to make it - *whether at that moment* the facts and circumstance within their knowledge and of which they had reasonable trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.") (emphasis added).

_____

[5]We pause to note that we need not and in fact do not decide today whether probable cause on the facts of this case actually existed at the time of arrest.

10

Mendenhall further emphasizes in his brief that the timing of his arrest itself is suspect, and lends support to his suit. Specifically, he draws our attention to the election for police chief to be held approximately one week after he was arrested. In essence, Mendenhall contends that his arrest was executed with the intention of undermining his chances in the election.

We are compelled to note first that it defies logic to conclude appellants in this matter successfully orchestrated the shooting of Deon Grisby by William Myles, followed by a chaotic chase in which Mendenhall happened to participate, concluding in the shooting death of Myles in which Mendenhall was subsequently implicated, all out of motivation to defeat Mendenhall's chances at the polls.

However, regardless of logic, and even assuming the worst - i.e., the appellant-deputies seized upon a mystical confluence of events to accomplish their nefarious goal of defeating Mendenhall in the upcoming election - we are compelled by our case law that clearly dictates subjective intent, motive, or even outright animus are irrelevant in a determination of qualified immunity based on arguable probable cause to arrest, just as an officer's good intent is irrelevant when he contravenes settled law. Anderson, 483 U.S. at 641 (citing Harlow, 457 U.S. at 815-20).

We proceed.  Mendenhall was arrested pursuant to a valid arrest warrant secured by Deputy Cropper.  Cropper obtained the warrant relying on information learned by him and other

11

investigating deputies over the course of the day of the murder. While a valid arrest warrant would normally insulate officers against a claim for false arrest, in a case such as the one before us where the officers charged with false arrest were responsible for securing the warrant, we are required to test the validity of that warrant, applying the usual standards. <u>See Malley</u>, 475 U.S. at 345-46.

The first and primary piece of evidence relied upon was the fact of the shooting itself. It is undisputed that Myles was killed by a single gun shot wound to the back of his head, indicating he was shot while fleeing the scene.[6]

Further information obtained from Wayne Walsh, the first emergency medical technician to arrive on the scene, pointed to Mendenhall as the prime suspect. Specifically, Walsh reported to investigating officers that Mendenhall, at the scene providing crowd control when the ambulance arrived, related that Myles was taken down by a "single head shot," in response to inquiries concerning the circumstances of the shooting. This fact was not

---

[6]Cropper, the lead investigating officer, concluded from this information that a crime had been committed, rather than a justifiable homicide in self-defense or in the line-of-duty. Mendenhall asserts that the shooting of Myles was, in fact, justified, as Myles was fleeing from a botched kidnaping in which another was shot and left for dead, and as he fled, he apparently fired his weapon into the air. Our independent review of the record indicates that on the day of the shooting the officers behaved reasonably in pursing the investigation as an inquiry into a suspected homicide.

immediately evident, as Myles was lying face up in the road.[7]

Mendenhall related first-hand information through the revelation

of this fact.  Further investigation proved Mendenhall correct.

Walsh further reported that Mendenhall tampered with

evidence at the scene.  Specifically, Walsh reported witnessing

Mendenhall pick up a silver revolver that was lying at the feet

of the victim, unchamber the rounds of ammunition in the weapon,

examine them, replace them in the chamber, and then place the

weapon back on the ground in essentially the same position in

which it was originally found.[8]

This foregoing information was obtained without the benefit

---

[7]In fact, Wayne Walsh, a trained emergency medical technician, could not determine the nature of the injury until the body was "rolled."

[8]While the dissent asserts that "the summary judgment record does not establish that, as a police officer faced with stressful, violent and chaotic circumstances, Mendenhall's conduct was unusual, let alone suspicious," our reading of Mendenhall's own deposition testimony supports the alternative position that even Mendenhall knew his behavior was anything but standard:

> Q:   Had anybody moved the body at this point?
> M:   No. The body was never moved.
> Q:   Why not?  Why didn't somebody move the body to see where
>      he was wounded?
> M:   They didn't want to touch him.
> Q:   Why no?
> M:   Like I said, I thought we was making enough boo-boo's as
>      it is.  Why, you know, you're not supposed to touch him
>      until the coroner get there.  That's one thing I do know.
>   - - -
> Q:   Now, you acknowledge that you made some errors in picking
>      up the gun and checking the empty shells?
> M:   Yes, sir.
> Q:   And that you probably should have, on second thought, not
>      given Ted the ability to leave?
> M:   Yes, second thought, yeah.

13

of John Mendenhall, as shortly before investigating officers Cropper and Null arrived at the scene, Mendenhall simply left, without offering any statement concerning the events of the day.[9] His sudden absence from the scene of a homicide, without any explanation, warranted further inquiry in the minds of lead investigators.

When investigating officers began to inquire of the officers on the scene as to the morning's events, Deputy Ashley reported speaking with two witnesses.[10]  It appears that Ashley, being one of the first officers to arrive after the shooting, began a canvass of the immediate area in an attempt to obtain witness statements and any other relevant evidence.  In so doing, he spoke with two witnesses who refused to give their names, but who affirmatively identified Mendenhall as the shooter.[11]

---

[9]The dissent reads this fact as reflecting poorly on the officers' investigative skills; essentially as a failure on the part of investigators to obtain Mendenhall's version of events at the scene.  However, our careful review of the record reveals that, in fact, Mendenhall departed while Ashley was securing the area and speaking with witnesses and Shaw was on the phone seeking assistance from superior officers.  Mendenhall, thus, left the scene before officers had an opportunity to question him.  Despite the dissent's insinuation that Mendenhall had no reason to cooperate, he was not, at this time, a suspect.  It was his voluntary, premature exit from the scene, before he could even be asked about the day's events, that led investigators to first question his role in Myles' shooting death.

[10]It should be noted Deputy Ashley is not a party-defendant to this lawsuit.

[11]The dissent maintains that Deputy Ashley's testimony actually reveals that neither witness ever said they saw Mendenhall shoot. A closer and more complete reading of Ashley's testimony, however, reveals that he was only trying to clarify those witness'

14

statements, not withdraw his testimony that they had identified Mendenhall:

> Q:  Okay.  That they didn't actually see him shoot, but he was out there with a gun?
> A:  Correct.
> Q:  Okay.
> A:  Didn't actually see him pull the trigger.
> - - -
> Q:  But, the essential stuff that they saw the guy get shot, John was the only guy they saw with a gun in his hand . . .
> A:  Chasing him.
> Q:  . . . but, that they didn't see him shoot the guy?
> A:  Actually pull the trigger.
> Q:  Right.
> A:  Correct.

Thus, the dissent's efforts to impeach Ashley by implying that he withdraws his testimony concerning the two witnesses is not borne out by the record.  Rather, Ashley simply clarified his testimony, under questioning, to be clear that the witnesses never actually saw Mendenhall pull the trigger - understandable, given the frightening nature of the scene witnessed.  This in no way undermines the reliability of the report he produced immediately following his investigation, in which he stated that "two of [the witnesses] said that John Mendenhall had shot the deceased in the head."  In fact, the dissent's general attempt to discredit this report and subsequent testimony is undermined by the very fact that Ashley filed his written report, complete with references to these witnesses, on the day of the incident and testified consistent with this report in his deposition testimony taken months later, in conjunction with this lawsuit.

Further, the dissent's additional attempt to discredit Ashley's report of these two witnesses by referencing ten witnesses supposedly interviewed by Cropper at the scene of the crime, who were supposedly unable to testify that Mendenhall shot Myles, is factually incorrect and misstates the record.  In the first instance, Cropper testified that he did not, in fact, successfully interview witnesses at the scene.  Rather, Ashley and Null canvassed the area, while Cropper's minor efforts to speak with local residents were generally met with resistance.  Thus, when Cropper referenced ten witnesses to these events during the Preliminary Examination, he was referring to witnesses generally, not simply eyewitnesses to the shooting.  His deposition testimony further reveals that some of them were, in fact, interviewed *after* the arrest (thus, they are not relevant to the matter before this Court today.)  Further, two of the ten witnesses mentioned by the

15

Somewhat later in the day, at the hospital where Grisby was receiving treatment, Ashley overheard what would be the third witness he reported identify Mendenhall as the shooter. Deputy Cropper received this reported identification not only from Ashley, but also from Deputy Newton, who while present at the hospital complied with Ashley's request to question the woman. Newton was selected, apparently, as he was more familiar with the residents in the relevant neighborhood. When Newton questioned this witness, whom he identified as Pamela Neal, as to the events she observed that morning, Newton reported, consistent with Ashley's report, that Neal identified Mendenhall as the shooter.

In an attempt to follow-up with Pamela Neal, who is also Deon Grisby's half-sister, deputies went to the home she shared with her Mother, Gertie, located at the scene of the shooting, approximately sixty feet from where Myles body lay in the street. Officer Jimmy Morgan, assisting with the investigation, accompanied Deputy Null to the Neals' home that afternoon.[12] He

dissent and referred to by Cropper as supporting probable cause were, in fact, the two witnesses interviewed and reported by Ashley. Thus, the dissent's assertion that "Cropper, who arrived soon after Ashley, interviewed approximately ten witnesses, all of whom apparently provided him their names," does nothing to undermine Ashley's report that the witnesses were reluctant to cooperate, as, in fact, it misstates the record and Cropper's role in interviewing witnesses.

[12]Appellee Mendenhall attempts to argue in his brief that Null met with Neal on two separate occasions on the day of Myles' shooting, and that this is somehow relevant to the outcome of this

16

questioned the Neals as to the events they witnessed earlier that day.  He maintains that Gertie and her daughter both reported seeing Myles running down the street, weapon in hand, followed by John Mendenhall, also bearing arms.  They then reported hearing shots fired, and when they looked next, having apparently ducked in fear, they saw Myles fall to the ground.  They further observed Mendenhall, weapon in hand, either standing somewhere near the slain body or near his vehicle.  It was obvious at that time that Myles fell victim to the gunfire they had just heard.  The Neals further stated no one else with a weapon was anywhere in the area.  Sometime during this visit, Pamela Neal executed a written statement as to the day's events.[13]

In deposition testimony concerning these events, Pamela Neal

---

appeal.  Specifically, appellee urges us to consider Null's purported deception in denying meeting with Neal a second time.  Our review of the record indicates, however, that Null and Neal met only once on September 13, 1996.  While Null and Neal appear to differ somewhat as to the time of this meeting – Neal remembers the meeting occurring in the afternoon, while Null is less clear as to the time – there is no summary judgment evidence that this second meeting ever took place.  Any argument offered by appellee concerning why certain questions were not asked by Null at this second meeting, therefore, cannot be considered by this Court, as there was no second meeting at which Null could have engaged in this inquiry.

[13]Deputy Null apparently requested Pamela Neal's statement concerning the events of that morning.  In response to this inquiry, Neal wrote and acknowledged the following statement: "Around 7:30 this morning I looked out of my front door.  A man was running down the street with a gun in his hand and shooting up in the air.  John Mendenhall was up the street in his truck.  The man ran passed [sic] John, and John yelled at him to stop.  The man jumped a ditch turned around shot up in the air.  I ducked.  When I looked up the man was hitting the ground.  And John was standing by his truck with a gun in his hand."

17

asserts that she never, in fact, identified John Mendenhall as the shooter, and she asserts her mother did not witness events nor answer questions concerning these events, as the deputies maintain.[14]  Specifically, she recalls discussing the day's events with Deputy Newton at the hospital, and specifically recalls informing Newton that another man - not Mendenhall - who apparently was driving a green car, shot Myles.  She claims, in her deposition testimony, that she was unaware of this individual's identity at that time, and did not provide a name to Newton.[15]  In fact, she denies ever identifying Mendenhall as the shooter, thus disputing Ashley's claim of overhearing her make just such a statement.  We address the consequences of this factual dispute below.

Further evidence gathered that day concerning the suspected murder weapon.  Specifically, officers at the scene recovered two spent nine-millimeter shell casings, despite finding no nine-

---

[14]Pamela Neal states in her deposition that her mother only witnessed Myles falling to the ground.  Her mother confirms this version of events in her deposition testimony, to the effect that upon hearing gunfire, and rushing to the door, she witnessed the victim falling to the ground, and nothing further.  She further confirms that her daughter, in speaking to Deputy Null that afternoon at their home, did not identify Mendenhall as the shooter, although it is difficult to gauge from her testimony the extent of her knowledge of the exchange between her daughter and Null.

[15]It should be noted that Neal admits in her deposition testimony that she was aware of the identification of this man - Ted Nellams - but, as she was dating Nellams at the time of the incident, she asserts she identified him only by virtue of the automobile he was then driving, out of fear of the police.

millimeter weapon anywhere near the body.  Inquiry by Deputy Null into whether Mendenhall possessed a weapon of that caliber revealed that Officer Todd Moore previously performed some repair work on a Tec-9 handgun, a nine-millimeter weapon, that belonged to  John Mendenhall.

In an attempt to obtain Mendenhall's version of events, Deputy Newton paid a visit to Mendenhall, at his residence.  In response to inquires as to the day's events, Mendenhall reported to Newton that he came upon Officer White at the scene of Grisby's shooting and subsequently left in pursuit of the shooter.  He said he chambered a round in his handgun - not his nine-millimeter weapon but a smaller caliber handgun he carried - but it jammed.  He then refused further comment.  Newton alerted Mendenhall that Cropper and Null, the investigating officers, wished to discuss the matter directly with him, and that he should report to the police station with all his weapons.  Mendenhall apparently replied that he might make an appearance.

Later that day, Mendenhall did report to the station house.  Prior to initiating the inquiry, Cropper read, and requested Mendenhall acknowledge by initialing, his <u>Miranda</u>[16] rights.  Cropper then proceeded to question Mendenhall concerning the shooting, beginning with questions as to whether Mendenhall possessed a nine-millimeter weapon.  Mendenhall apparently answered those initial questions, but as soon as the interview

---

[16]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

focused more intently on the morning's events, Mendenhall refused to provide additional information.  Mendenhall maintains that his silence came in response to, and out of shock at, having been read his rights.  He did nothing more, he now claims, than assert those rights as he understood them.

We pause in our factual recitation to quickly note that Mendenhall's purported motivation in refusing to answer questions is irrelevant.  The indisputable fact, for summary judgment purposes, is his refusal and his subsequent departure from the station house shortly thereafter.[17]

Deputy Null followed Mendenhall, in an attempt to convince Mendenhall to talk.  Mendenhall refused, saying only that if the deputies could exercise patience until Monday, he would provide them with all relevant evidence concerning the shooting.

After this failed attempt to secure Mendenhall's cooperation, Deputy Cropper sought and obtained the arrest and search warrants.[18]  Mendenhall was arrested later that evening.

---

[17]The dissent describes the failure of investigators to obtain Mendenhall and Officer White's version of events as the biggest missing piece in the probable cause puzzle.  However, both men were interviewed and presented with ample opportunity - at the scene, and later - to provide their understanding of the day's events.  Mendenhall himself testified that he allowed Ted Nellams to leave the scene of the crime because he planned to remain behind, in order to relate the manner of the shooting to investigators - something he then failed to do.

[18]The dissent acknowledges that the officers were justified in seeking a search warrant for Mendenhall's nine-millimeter pistol, but posits that they should have done so first, prior to arrest, in order to conduct ballistics tests.  While professional courtesy, as we imagine is extended from one officer to the next, might point

20

Upon careful consideration of the above facts, and after an exhaustive review of the summary judgment record in this case, we find, as a matter of law, that a reasonable officer in Deputy Cropper's position could believe probable cause existed to arrest Mendenhall for the murder of William Myles. Even after drawing all available inferences in Mendenhall's favor, we are compelled by the facts to so hold.

Our exhaustive review of the record reveals one significant dispute with respect to the relevant facts: the identification

---

towards this approach, the officers were by no means required under the law to search first and arrest later. In fact, as the officers' testimony reveals, there was concern that evidence was being lost as every moment passed.

The law requires that the officers, in order to arrest, must have probable cause just as they would need in order to search. In this case, the requisite probable cause appears to be coterminous. Simply stated, a warrant to search for Mendenhall's gun would have required probable cause to believe that the weapon to be searched for was evidence of a crime. The only applicable crime on these facts is murder. Our case law, following the Supreme Court, makes clear that probable cause to search is no different than probable cause to arrest. See United States v. Brouillette, 478 F.2d 1171, 1177 (5th Cir. 1973)("It is well recognized that the probable cause required to justify a search warrant is coextensive with the probable cause required to justify an arrest warrant.") The dissent states: "[T]wo spent nine-millimeter shell casings were found at the scene and . . . Mendenhall was thought to have had a nine-millimeter pistol. This information would have justified the officers in seeking a search warrant for Mendenhall's pistol." Certainly the dissent does not mean to imply that probable cause exits on these facts to search the home of every individual in the community known to possess a nine-millimeter weapon. The only conclusion to be drawn from this statement is that the presence of the shell casings, *coupled with Mendenhall's actions that morning*, gave the officers probable cause. We simply fail to see how the officers could have had probable cause to search for a suspected murder weapon owned by Mendenhall, as the dissent maintains, but not probable cause to arrest Mendenhall for murder, under the unique facts of this case.

21

provided by Pamela Neal.  As we must, we view this factual dispute in the light most favorable to Mendenhall.  The dispute can be briefly summarized:  Ashley maintains that he overheard Neal identify Mendenhall as the shooter;  Newton, Null and Morgan maintain that Neal made the same identification in response to inquiries; Neal maintains that she identified a different man.

Even if Neal is correct, and Null and Newton now mis-state her identification, we find this dispute to be immaterial to the inquiry now before us - whether a reasonable officer could have believed probable cause existed to arrest Mendenhall.

As we emphasized earlier, probable cause analysis requires us to look to the totality of the circumstances to determine whether the officers in this case behaved reasonably.  Neal executed a handwritten statement placing Mendenhall at the scene with a weapon.  Her statement made no indication of another as responsible for the shooting death of Myles.  In fact, her statement omits entirely any reference to another party at the scene with a weapon.  Even if, as she asserts, she informed Newton, in response to questioning, that the man in the green car committed the shooting, and even if she later repeated this statement to Null and Morgan, a reasonable officer - affording these statements appropriate weight in the probable cause analysis, reading them in conjunction with her handwritten statement which excluded any reference to this other man, and considering the totality of the remaining evidence pointing to

22

Mendenhall as the shooter - could still conclude probable cause to arrest existed.

The undisputed facts, simply summarized, and disregarding the controversial identification from Pamela Neal, are: investigating deputies spoke with two witnesses who affirmatively identified Mendenhall as the shooter; another witness, Pamela Neal in her handwritten statement, placed Mendenhall at the scene with a weapon; medical personnel reported Mendenhall's uncanny knowledge of the wound and Mendenhall's eagerness to finger evidence relating to a homicide; investigating deputies obtained two spent nine-millimeter shell casings from the scene, and later became aware that Mendenhall possessed such a caliber weapon; and Mendenhall refused to cooperate or answer questions concerning the killing. Under such a factual scenario, we simply cannot conclude that it was unreasonable for an officer to believe he had probable cause to arrest John Mendenhall.[19]

### III.  CONCLUSION

Mendenhall was at the scene of a homicide, holding a weapon. He was identified as the shooter and was known to be in possession of a weapon that matched the suspected murder device. He fled the scene when investigators arrived, and he subsequently

---

[19]Because we find the officers in this case behaved reasonably, and are thus entitled to qualified immunity, we need not reach the argument advanced by appellants concerning the related offense doctrine.

refused to answer questions.  His arrest was reasonable, as it was based on arguable probable cause and a civil action for damages under § 1983 cannot be maintained on these facts. It matters not for the purposes of this analysis that a later hearing, aided by the confession of another individual, resulted in Mendenhall's release from custody and bail.  "The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested." Graham v. Connor, 490 U.S. 386, 396 (1989) (citing Hill v. California, 401 U.S. 797 (1971)). As such, we REVERSE the order of the district court denying qualified immunity and REMAND to the district court for dismissal of the claims asserted by Mendenhall pursuant to 42 U.S.C. § 1983 and for such other proceedings that are not inconsistent with this opinion.

REVERSE and REMAND.

24

EMILIO M. GARZA, Circuit Judge, dissenting:

I would affirm the district court. Much about this case is disputed. If the evidence is viewed in the light most favorable to the nonmovant, Mendenhall, there are material issues of fact precluding summary judgment.

Mendenhall raises two claims under § 1983, based on his false arrest for William Myles's murder. The first is that a reasonable officer would not have believed that probable cause existed to arrest him. *See Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991); *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994). The second is that the arresting officers knowingly or recklessly submitted a false and misleading affidavit to obtain his arrest warrant. *See Franks v. Delaware*, 438 U.S. 154, 171-72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *Hale v. Fish*, 899 F.2d 390, 400-02 (5th Cir. 1990). Material fact issues remain as to both claims.

Mendenhall was arrested the day of Myles's shooting, September 13, 1996. While the investigation at the scene of the shooting appears to have been the basis for Mendenhall's murder arrest,[20] the eyewitness testimony that emerged did little to provide probable cause for that arrest. Deputy Ashley claims

---

[20] The majority notes that the "investigators' focus soon shifted to Mendenhall, as two witnesses identified him as the shooter." It is unclear what further investigation, other than the contested discussions with Pamela and Gertie Neal and with Mendenhall, preceded the seeking of the arrest warrant against Mendenhall.

25

that two anonymous witnesses at the scene identified Mendenhall as the shooter.  Specifically, his written report states that the two witnesses had "said that John Mendenhall had shot the deceased in the head."  However, in deposition Ashley admitted that neither witness even saw Mendenhall fire a weapon.[21]  Deputy Cropper, who arrived soon after Ashley, interviewed approximately ten witnesses, all of whom apparently provided him their names.[22] Pressed in his deposition, Cropper, who actually prepared the arrest affidavits and obtained the warrant, admitted that prior to Mendenhall's arrest no witness had told him that Mendenhall had fired a gun, let alone shot Myles.[23]

---

[21]    When asked if the anonymous witnesses testified "[t]hat they didn't actually see him shoot, but he was out there with a gun," Ashley responded, "Correct."

The majority argues that Ashley's clarification is no way affects the credibility of his statement that the two witnesses said that Mendenhall had shot Myles in the head.  The record speaks for itself.  I believe jury members might reasonably disagree, finding the explanation that the witnesses said that they saw only Mendenhall with a gun at the scene of the shooting to differ materially from the statement that the witnesses said they saw Mendenhall shoot Myles.  More generally, the existence of a reasonable disagreement with regard to Ashley's testimony, among other material aspects of the record, itself indicates that summary judgment is inappropriate.

[22]    It is difficult to believe that the officers could not obtain names from the only two eyewitnesses who "saw" Mendenhall shoot Myles, especially as Cropper obtained names from each of ten witnesses who did not see this, as well as written statements from Neal, Belinda Harris, and Dexter Turner.  At the very least, the anonymous nature of Ashley's witnesses renders them less worthy of reliance.

[23]    Cropper stated that Monica King was the only witness to tell him that Mendenhall had fired and Cropper did not interview King until after Mendenhall's arrest.

26

The officers claim that Pamela Neal also identified Mendenhall as the shooter. In her deposition, Neal claims that she not only did not identify Mendenhall as the shooter, but that she informed the deputies that a man in a green car, not Mendenhall, shot Myles. The majority "disregard[s] the controversial identification" from Neal, but on summary judgment we are required to affirmatively consider the evidence in the light most favorable to Mendenhall. Neal's deposition testimony is not contradicted by her written statement, which does not identify Mendenhall as the shooter or even state that Mendenhall fired his gun. Therefore, viewing the evidence favorably to Mendenhall, we are required to credit Neal's testimony that she informed the officers that a man in a green car, not Mendenhall, shot Myles. While Neal's credibility may have been questionable, her statements would reasonably have pointed toward further investigation, prior to Mendenhall's arrest, into other possible suspects.[24]

Therefore, the summary judgment record suggests that the alleged eyewitness testimony pointing to Mendenhall as the

---

[24] The majority states that the dispute over Neal's testimony is immaterial. To the extent to which the majority concludes, even if we accept that Neal informed the officers that 1) Mendenhall was not the shooter, and 2) a man in a green car was the shooter, a reasonable officer nevertheless would have believed probable cause for Mendenhall's arrest existed, I disagree. The unreasonable shallowness of the investigation preceding Mendenhall's arrest is exacerbated if we assume, as I believe we must, that Neal pointed to another man. As it turned out, Neal's alleged statements were accurate: the man in the green car was Ted Nelams, the shooter.

27

shooter is extremely weak.  The other information on which the majority relies to find that a reasonable officer could have found probable cause to arrest Mendenhall is, to me, equally underwhelming.  It is reasonably explained by the undisputed fact that Mendenhall was a police officer on the scene pursuing a dangerous criminal at the behest of Cullen Officer White.[25]

The officers did not have a suspected murder weapon in their possession at the time of Mendenhall's arrest.  The majority notes that two spent nine-millimeter shell casings were found at the scene and that Mendenhall was thought to have had a nine-millimeter pistol.  This information would have justified the officers in seeking a search warrant for Mendenhall's pistol.[26]  However, the officers had not even obtained such a

---

[25]    Two witnesses, Belinda Harris and Dexter Turner, gave statements to the investigating officers in which they affirmed that at least six shots were fired in the course of the pursuit of Myles.  Echoing Neal, Turner added specifically that he saw Myles shooting a gun as he ran through the streets.

[26]    The majority claims that, by acknowledging that the officers could reasonably have sought a search warrant for Mendenhall's nine-millimeter pistol, I have acknowledged that they also acted reasonably in arresting Mendenhall for murder.  I disagree.

To support the proposition that probable cause to search for Mendenhall's pistol and probable cause to arrest Mendenhall for murder are coterminous, the majority cites *United States v. Brouillette*, 478 F.2d 1171, 1178 (5th Cir. 1973) ("It is well recognized that the probable cause required to justify a search warrant is coextensive with the probable cause required to justify an arrest warrant.").  We have never repeated this statement or cited *Brouillette* for this proposition.  Moreover, *Brouillette* is readily distinguishable.  In *Brouillette*, we held that federal officers must, to obtain a search warrant for a suspected house of prostitution, show probable cause for believing that an offense had been committed.  *See id.* at 1176-77.  We held that the search warrant at issue was invalid for failure to show probable cause.  *See id.* at 1177.  To support that conclusion, we stated that no arrest warrant, for any crime, could have been obtained.  *See id.*

warrant at the time they obtained the arrest warrant for

Mendenhall, let alone performed the requisite ballistics tests on

_____

Therefore, in *Brouillette* we did not find that the existence of probable cause for a search warrant of an item suspected of use in a crime established probable cause for an arrest warrant. Rather, we held the converse: that the absence of probable cause for an arrest warrant, due to the lack of a showing that a crime had occurred, indicated the absence of probable cause for a search warrant. *See also Giordenello v. United States*, 357 U.S. 480, 485-86 (1958) (stating that the Fourth Amendment applies to both arrest and search warrants, and ultimately invalidating an arrest warrant for lack of probable cause) (cited in *Brouillette*).

Therefore, *Brouillette* does not establish that probable cause to search for Mendenhall's pistol was coterminous with probable cause to arrest Mendenhall for Myles's murder, and under the circumstances I believe the two were not coterminous. Probable cause for a search warrant does not require probable cause to arrest the person whose property is to be searched. *See United States v. Melvin*, 596 F.2d 492, 496 (1ˢᵗ Cir. 1979); *Zurcher v. Stanford Daily*, 436 U.S. 547, 554 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."). "[W]ith respect to a person who the police do indeed suspect but do not have probable cause to arrest, such a person's property may be searched upon probable cause to believe that fruits, instrumentalities, or evidence of crime are present, even though the products of the search may implicate him." *Melvin*, 596 F.2d at 496. In *Melvin*, the First Circuit found that there was probable cause to search Melvin's property for instrumentalities or evidence of a crime based on an affidavit providing a reasonable suspicion that Melvin had committed the crime, even though that affidavit did not provide probable cause to arrest Melvin. *See id.* at 496-97 (noting that a contrary holding would "render property searches ineffective as tools of criminal investigations in many cases"). *See also United States v. Rojas*, 671 F.2d 159, 165 (5ᵗʰ Cir. 1979) ("[T]he facts necessary to show probable cause to arrest are not necessarily the same as those required to show probable cause to search.") (citing *Melvin* ).

In this case, as in *Melvin* and not *Brouillette*, it is clear that a shooting had occurred. Mendenhall had been placed at the scene with a gun. Mendenhall was suspected of having a nine-millimeter pistol and two nine-millimeter shell casings had been recovered at the scene. Obtaining and testing Mendenhall's weapon would have resolved the question of whether Mendenhall's weapon had been fired and, if it had, whether it was the weapon used in the shooting. *Cf. Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967) (holding that government may search for "mere evidence" of a crime and that "in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction"); *Rojas*, 671 F.2d at 165 ("[P]robable cause to search exists when facts warrant a reasonable person to believe that the objects sought in connection with a crime will be found.") (internal citation omitted).

29

the pistol.[27]  The fact that Mendenhall, a policeman, was suspected of having a nine-millimeter did little to provide probable cause to arrest him for the murder of Myles.

The majority also notes that Mendenhall handled Myles's weapon at the crime scene.  Mendenhall's uncontested testimony is that he picked up Myles's gun to make sure that there were no live rounds still in the gun.  Mendenhall removed the shells from the gun and, seeing that there were no live bullets, rechambered the empty shell casings.  The summary judgment record does not establish that, as a police officer faced with stressful, violent and chaotic circumstances,[28] Mendenhall's conduct was unusual, let alone suspicious.[29]  Therefore, a fact issue remains as to whether that conduct provided any cause for arresting him for Myles's murder.

Perhaps the biggest flaw in the officers' brief pre-arrest

---

[27]    The search warrant was obtained at the same time as the arrest warrant for Mendenhall.  J. Schuyler Marvin, the Webster Parish assistant district attorney assigned to the case, testified that his office was not consulted prior to the arrest and that he would have preferred that the ballistics results been sought before the arrest warrant was obtained.    The ballistics report exonerating Mendenhall was ultimately obtained just after the expedited preliminary examination.

[28]    Asked whether there were people milling about the crime scene, Wayne Walsh noted that "there were people all over" and that Mendenhall, the only policeman on the scene, was "providing crowd control."

[29]    The majority notes that Mendenhall admitted to certain technical errors at the crime scene.  There is evidence in the record, however, that these errors were not rare and that in other instances they gave rise to little concern, let alone suspicion of criminal activity on the part of the officer.

investigation was their failure to adequately examine Officer White. White and Mendenhall have provided consistent testimony as to the events at the crime scene. The appellants have not expressly claimed that this testimony is false; even if they had, on summary judgment, we are required to credit it. According to White and Mendenhall, White was the first police officer at the scene, Mendenhall the second. White sent Mendenhall to Lee Street to pursue Myles, while White completed the arrest of two suspects. When White subsequently arrived on Lee Street, Mendenhall told White that Ted Nelams shot Myles in self-defense. White gave Mendenhall permission to leave the scene, to check on Deon Grisby at the hospital.

Yet, while White apparently led the Webster Parish investigators to the scene of Myles's death, they did not ask White any questions about what had happened.[30] The investigators took over the crime scene and immediately dispatched White to investigate an auto accident. White complied, albeit unhappily.[31] Later, Deputy Null apparently spoke to White, but

---

[30] Mendenhall later returned to the crime scene. Ashley and Deputy Shaw both stated that they saw him there. But no investigator talked to Mendenhall at the scene.

[31] White was displeased that, even though he was the police officer in charge, as soon as he led the investigators to the scene, they left without questioning him to speak to the ambulance personnel. White was equally dismayed that the investigators then dispatched him to the auto accident, which he claims was outside his jurisdiction. With reference to the crime scene, he stated, "I didn't relinquish it; they took it . . .That was my crime scene and they took it. . ." He concluded that the investigators "ignored me. They treated me like I was nothing." Adding that "[t]hey

it does not appear that White was asked about Mendenhall's role in the incident.[32]  Cropper confirmed that he did not ask White why Mendenhall was at the crime scene, and was not aware of any such inquiry by any of his colleagues, prior to seeking the arrest warrant.  Clearly, a reasonable policeman would have thoroughly examined White before seeking an arrest warrant against Mendenhall, a fellow policeman.  Mendenhall explained his subsequent silence to the investigating officers by noting that 1) he answered questions until the officers were asking only whether he had shot Myles, not whether he had any information about the crime;[33] 2) he was shocked that he was considered a suspect; and 3) he did not wish to answer these particular questions without an attorney present.  Mendenhall's explanation is buttressed by the officers' apparent treatment of White and by the entire tenor of the investigation that preceded Mendenhall's arrest.  Reading the summary judgment record favorably to Mendenhall, it appears that he could reasonably have believed that the officers had unfairly fixed upon him, that they would not have considered information he could have provided pointing

---

ain't asked me nary a question, not one," White stated that he did not volunteer information because the investigators would not have listened to him.

[32]    White's deposition testimony suggests that the discussion with Null occurred *after* the arrest warrant for Mendenhall was issued, but this is not clear.

[33]    As the majority notes, Mendenhall apparently told Deputy Newton that his gun had jammed.  In the meeting at the station-house, Mendenhall reiterated that he had not shot Myles.

away from him or toward another shooter, and therefore that there was no point in speaking to the investigators without an attorney.[34]  Such a silence would not provide probable cause for his premature arrest.[35]

I recognize that probable cause is assessed not by any individual factor, but by the totality of the circumstances. *See Illinois v. Gates*, 462 U.S. 213, 241, 103 S.Ct. 2317, 6 L.Ed.2d 527 (1983).  I also recognize that, to have qualified immunity, the defendants need only have had a reasonable belief, at the time of arrest, that probable cause existed. *See Hunter*, 502 U.S. at 227, 112  S.Ct. 534 (1991).   However, probable cause exists only if, at the time of arrest, "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient

---

[34]   As the majority notes, after eight years in the Webster Parish  Sheriff's Office, Mendenhall apparently was discharged by Sheriff Riser when Riser took office in June 1996.  Mendenhall had been convicted of burglary in Houston in 1987 or 1988.  The record clearly suggests enmity between Mendenhall, who is black, and a number of the investigating officers from the Sheriff's Office, all of whom are white.   Mendenhall was running for Cullen Police Chief, and the election was to be held on September 21.  Cullen is the third-largest city in Webster Parish.   After his arrest, Mendenhall, a Cullen native, an NFL Hall of Fame nose tackle and, allegedly, a local hero, narrowly lost the election.  The expedited preliminary hearing was not held until September 23.

[35]   While remaining silent, Mendenhall apparently stated at the station-house that, if given until Monday, he would provide the evidence he had regarding the shooting.   Mendenhall's offer highlights the prematurity of his arrest by suggesting that 1) there was no legitimate rush to take him into custody, and 2) the officers were more interested in arresting Mendenhall than in learning what really happened.

33

to warrant a prudent man in believing" that Mendenhall had committed second degree murder. *Id.* at 228, 112 S.Ct. 534. Reading the summary judgment record in the light most favorable to Mendenhall, I am unprepared to conclude that a prudent Webster Parish officer, possessing only the limited and equivocal information that had been produced by a brief investigation targeted at Mendenhall, could reasonably have believed at the time of arrest that Mendenhall was guilty of second-degree murder. Therefore, I disagree with the majority's premature conclusion that, as a matter of law, a reasonable officer in Cropper's shoes could have concluded that probable cause existed for Mendenhall's arrest for the murder of Myles.

Mendenhall's second claim is that the affidavit used to arrest him contained material misstatements or omissions that were made recklessly or intentionally. We have also required, to show a constitutional violation sufficient to overcome qualified immunity, that: 1) the misstatements or omissions have been "of such character that no reasonable official would have submitted it to a magistrate"; and 2) that the misstated or omitted facts be "clearly critical" to a finding of probable cause, such that probable cause would not exist without them. *See Hale*, 899 F.2d at 400-02; *Morin v. Caire*, 77 F.3d 116, 122 (5th Cir. 1996).

The affidavits submitted to the magistrate by Cropper to obtain an arrest warrant for Mendenhall read:

> On the morning of September 13, 1996,
> approximately 7:30 A.M. a homicide occurred in the

34

middle of the street, in front of 427 Lee Street, Cullen, Louisiana. Witnesses state that they observed John Mendenhall, black/male, pull a weapon, assault-style, from his vehicle, chase on foot, fire a shot in the direction of the victim then place the weapon back inside his vehicle, and leave the scene. John Mendenhall was contacted by law enforcement, asking him to make a formal statement and turn over the weapon, but refused. [Search Warrant Affidavit]

[To the best of my knowledge and belief, Mendenhall] did commit in the following manner an offense contrary to law by chasing a black/male by the name of William D. Myles, down Lee St. Cullen, Louisiana, armed with a 9 mm pistol, then firing the 9 mm pistol, striking William D. Myles in the back of the head, causing death. After shooting William D. Myles put the 9 mm pistol back into his vehicle, then leave the scene, before talking to Investigating Officers. John Mendenhall had specific intent to inflict bodily harm. Therefore violating L.R.S. 14:30.1, Second Degree Murder." [Arrest Warrant Affidavit][36]

A number of facts apparently material to the magistrate's probable cause determination were omitted from these affidavits. Cropper did not note that Mendenhall was an off-duty police officer who had been asked by White to help him apprehend Myles. Nor did Cropper explain that Myles was a dangerous criminal who had been firing his gun as he fled the scene of a shooting. Nor, finally, did Cropper note that the relevant witnesses were anonymous, and that a substantially larger number of witnesses did not state that Mendenhall shot Myles.

The summary judgment record also suggests that certain

---

[36] While the first affidavit is technically in support of the application for a search warrant, and the latter an arrest warrant, the two affidavits were apparently submitted together and were both before the magistrate when he decided to grant the arrest warrant. Appellants' claim that both affidavits should be considered together therefore seems reasonable.

statements in the affidavits were false.  In the search warrant

affidavit, Cropper claims that "witnesses" provided a vivid

picture of Mendenhall pulling a gun and firing it at Myles.

However, Cropper himself admitted that, at the time of arrest, no

witnesses had told him Mendenhall even fired at all.  Ashley,

whose anonymous witnesses provided the only purported testimony

that Mendenhall killed Myles, also admitted that those witnesses

did not see Mendenhall shoot.  Therefore, the key factual

statement in the affidavit was, the summary judgment record

suggests, false.

The arrest warrant affidavit consists entirely of conclusory

allegations.[37]  With the exception of the statement that

Mendenhall left the scene without speaking to investigators, it

also appears false.  Mendenhall did not fire his pistol, did not

shoot Myles, and did not commit second-degree murder.

It appears that the material misstatements and omissions

were "clearly critical" to the  existence of probable cause.[38]

---

[37]    To the extent to which this section instead gives the
impression that Cropper had firsthand knowledge to support the
statements made, Cropper has admitted that impression was false.
Cropper did not witness any of the events described in the
affidavits.  He did not tell the magistrate this, however.

[38]    The officers have alleged that Cropper engaged in a phone
conversation with the magistrate, and provided a number of facts
that supplied a basis, beyond the affidavits, for the issuance of
the warrant against Mendenhall.  However, the officers have not
alleged any specifics about what was said, or provided evidence to
support their claim that the magistrate did not rely on the
affidavits.  The only record evidence on the point is Deputy Jimmy
Morgan's testimony that he heard Cropper tell the judge that "some
of the people up there had told them that John shot him."  Morgan

Removing the misstatements would, in essence, leave only the fact that Mendenhall did not speak to investigating officers. This fact alone is insufficient, as Deputy Null admitted, to provide even arguable probable cause for Mendenhall's arrest.

The omitted information regarding the witnesses, notably their anonymity and that they did not see Mendenhall fire his weapon, also appears to have been critical. Likewise, as I have discussed, the omitted circumstances surrounding Mendenhall's conduct, if included, might have defeated the existence of probable cause for his murder arrest. Therefore, the omitted information also appears to have been "clearly critical" to the finding of probable cause.

The only remaining question is whether, on summary judgment, we are prepared to conclude as a matter of law that 1) the misstatements and omissions were neither intentional nor reckless; or
that 2) the misstatements and omissions were not of such a

_____

could not recall anything else Cropper told the judge; clearly his testimony does not suggest that Cropper's phone statements provided probable cause for Mendenhall's arrest. Therefore, at least in the context of a summary judgment motion against Mendenhall, we must assume that the affidavits were the sole evidence before the magistrate. *See United States v. Jackson*, 818 F.2d 345, 350 (5th Cir. 1987) ("Our review is limited to the affidavit itself because the government presented no evidence to the district court to indicate whether other facts may have been before the magistrate and considered by him in his determination of probable cause."); *Hale*, 899 F.2d at 401 (rejecting claim that other information not in affidavit was provided to magistrate because "Major Jones does not state the substance of this information and cites no place in the record where it may be found.").

37

character that a reasonable officer would not have submitted the magistrate. *See, e.g., Hale*, 899 F.2d at 400-02. Reading the evidence in the light most favorable to Mendenhall, I am not prepared to draw either conclusion. As to the misstatements, the officers knew what the witnesses told them. Rather than present what they were told, they apparently mischaracterized the witnesses' statements. They then relied almost entirely on those apparent mischaracterizations and on conclusory statements in seeking an arrest warrant, rather than presenting the facts they did have. In the absence of the apparent misstatements, at the very least a fact issue remains as to whether the affidavit approached a showing of probable cause, and therefore as to whether any reasonable officer would have submitted such an affidavit in search of an arrest warrant. *See Malley v. Briggs*, 475 U.S. 335, 344, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) ("Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost.") (internal citation omitted). As to the omissions, we have held that when the omitted facts are "clearly critical" to a finding of probable cause, recklessness can be inferred from proof of the omissions themselves. *Hale*, 899 F.2d at 400.

Therefore, I disagree with the majority's decision to grant summary judgment to the defendants based on qualified immunity. I would affirm the district court's denial of summary judgment.

38